**Ex parte Steven Kenneth STALEY, Applicant.**

**No. WR–37034–02.**

Court of Criminal Appeals of Texas.

April 27, 2005.

---

Jack Strickland, Fort Worth, for appellant.

C. James Gibson, Assist. DA, Fort Worth, Matthew Paul, State's Attorney, Austin, for state.

***ORDER***

PER CURIAM.

Pursuant to the provisions of Article 11.071 of the Texas Code of Criminal Procedure, applicant filed an application for writ of habeas corpus seeking relief from his death sentence. We have reviewed that application and conclude that it must be dismissed as a subsequent application that does not satisfy the requirements of Section 5(a)(1) of Article 11.071; thus, consideration of the merits of applicant's claim is barred.

### I.

In January 1991, applicant was convicted of the capital murder of Robert Read during a robbery in Tarrant County. Based upon the jury's responses to four special issues, the trial judge sentenced him to death. His conviction was affirmed on direct appeal. *Staley v. State*, 887 S.W.2d 885 (Tex.Crim.App.1994). Applicant's writ of certiorari to the Supreme Court on direct appeal was denied on March 20, 1995. *Staley v. Texas*, 514 U.S. 1020, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995). He then filed his original application for a writ of habeas corpus with the convicting court on October 14, 1997, and this Court denied relief on September 16, 1998. *Ex parte Staley*, No. 37,034–01 (Tex.Crim.App. Sept. 16, 1998) (not designated for publication). Applicant's request for federal habeas corpus relief was denied by the federal district court on September 19, 2003. *Staley v. Dretke*, No. 4:99–CV–186–Y, 2003 WL 22290536 (N.D.Tex. Sept. 19, 2003). The trial court set applicant's execution date for March 23, 2005. On March 22, 2005, one day before that scheduled execution, this Court received a second, subsequent writ application.[1] We

---

1. This Court does not condone the filing of eleventh hour writs or motions in any case, much less death-penalty cases in which the stakes are so high, absent a showing of good

granted applicant's motion for a stay of execution so that we would have sufficient time to determine whether his current *Penry* claim meets the requirements of Section 5(a)(1) of Article 11.071.

## II.

Applicant's trial took place in April 1991. In June 1989, the United States Supreme Court had delivered its opinion in *Penry v. Lynaugh (Penry I )*.[2] *Penry I* held that, although the Texas statutory special issues are a facially constitutional and sufficient framework for death-penalty punishment decisions, those special issues may sometimes be insufficient to protect a defendant's right to have the jury consider and give effect to certain types of mitigating evidence.[3]

The 1989 *Penry I* decision created a dilemma for Texas trial courts in capital-murder cases. As the Fifth Circuit has noted, Texas trial courts "could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend the trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown."[4] Thus, Texas state courts attempted to provide timely trials that complied with *Penry I* by drafting extra-statutory jury instructions or supplemental special issues until the Texas Legislature enacted a statutory mitigation special is-

sue which went into effect on September 1, 1991.[5]

In this particular case, the trial judge submitted to the jury a fourth special issue, styled "the Question," during the punishment phase which read:

> Do you find from the evidence beyond a reasonable doubt, after considering all mitigating evidence, if any there be, and considering the defendant's level of culpability, character and background and the circumstances of the offense, that the penalty of death is the appropriate punishment?
>
> In your verdict, you will answer "Yes" or "No."
>
> ANSWER: _____.

On the page before the Question, the trial court had instructed the jury that

> "Mitigating evidence" may be evidence about any aspect of the defendant's background, character or the circumstances of the crime of which you have convicted the defendant, which you believe makes the penalty of death inappropriate. Under our law mitigating factors are not set out or limited by law.
>
> If there is mitigating evidence, you must consider such evidence and decide how much weight to give any such evidence. You are the sole judges of how much weight any such evidence, if any, deserves.

cause. We will not reject a death-row inmate's last-minute application merely because it is untimely, but we will not hesitate to reject it expeditiously if we conclude that it is frivolous or filed solely as an attempt to delay.

**2.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**3.** *Id.* at 315–17, 328, 109 S.Ct. 2934.

**4.** *Robertson v. Cockrell,* 325 F.3d 243, 248 (5th Cir.)(en banc), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003); *see*

*also State v. McPherson,* 851 S.W.2d 846, 849–50 (Tex.Crim.App.1992) (noting that this Court had "grappled with the application of *Penry* " for some time; upholding the submission of an extra-statutory special mitigation issue).

**5.** *See Robertson,* 325 F.3d at 249 (noting that "dozens" of capital-murder trials were conducted during this "hiatus" using extra-statutory *Penry I* instructions).

Therefore, in light of the foregoing instructions, if evidence has been presented to you by either side in mitigation of the death penalty, and after considering such evidence, if any there be, you are not persuaded beyond a reasonable doubt that death is the appropriate sentence, you will answer the following question "No." If you are persuaded beyond a reasonable doubt that death is the appropriate sentence, you will answer the following question "Yes." If you have a reasonable doubt as to whether the question should be answered "No" or "Yes," you must resolve the matter in favor of the defendant and answer the question "No."

Earlier in the punishment charge, in reference to the statutory special issues, the trial court had instructed the jury:

During your deliberations you shall consider mitigating circumstances, if any, presented by either party, that was [sic] admitted for your consideration in both phases of the trial.

A mitigating circumstance may be any aspect of the defendant's character, background or the circumstances of the crime for which you have found the defendant guilty, which you believe makes a sentence of confinement for life appropriate.

Thus, the trial judge instructed the jury to consider mitigating circumstances both as those circumstances might apply to the answers to the three statutorily authorized special issues and, with a lengthier definition and greater explanation, to the extra, non-statutory Question. These instructions and the Question required the State to prove beyond a reasonable doubt that there were insufficient mitigating circumstances to call for a sentence of life imprisonment.[6]

The jurors in applicant's case answered the Question "Yes." They unanimously found, beyond a reasonable doubt, that, even considering all of the mitigating evidence and applicant's level of culpability, "the penalty of death is the appropriate punishment."

Applicant's concern, however, is not with the mitigation instructions or the Question *per se.* Rather, his claim deals with the judge's instructions concerning what the jury should do if it had answered the Question "No," finding that it was not convinced, beyond a reasonable doubt, that the penalty of death was the appropriate punishment. Under the answer line for the Question, the trial judge included the following instruction, which applied only if the jury answered the Question "No":

---

**6.** These instructions and the extra-statutory special issue were considerably more favorable toward applicant than current Texas law requires.

First, the current statute, TEX.CODE CRIM. PROC. art. 37.071, § 2(d)(1), requires jurors to be instructed that, in answering the "future dangerousness" and "anti-parties" special issues, they shall consider all evidence admitted at the guilt stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. The jury in this case was not instructed that it must consider evidence about the defendant's background or character that "militates for"

the death penalty. It was told only that it must consider "mitigating circumstances" about the defendant's character, background or circumstances of the crime.

Second, the jury was explicitly required to find, *beyond a reasonable doubt*, that, even after considering all mitigating evidence and applicant's level of culpability, the penalty of death was still the "appropriate punishment." The jury was informed that any reasonable doubt must be resolved in applicant's favor. Under current law, TEX.CODE CRIM. PROC. art. 37.071, § 2(e)(1), the State has no burden of proof, much less a burden of proof "beyond a reasonable doubt," to disprove the mitigation value of evidence.

If you have answered the foregoing question "No," you are instructed to draw a single line through the word "Yes" which you have previously written as your answer to Special Issue No. 1, and to answer Special Issue No. 1, "No."

That is, if the jury had found, based on the mitigating evidence and applicant's level of culpability, that the death penalty was not the appropriate sentence, then it should go back to the "future dangerousness" special issue, cross out its original answer of "Yes" and instead answer that issue with a "No."[7]

On the preceding page of the jury instructions, immediately before the Ques-

---

7. This methodology was intended to ensure that both *Penry I* and Texas statutory law were followed. The Texas statute, at that time, allowed for only three special issues. The death penalty was or was not imposed based upon the answers to those—and only those—special issues. TEX.CODE CRIM. PROC. Art. 37.071 (Vernon 1990). Under the Texas law then in effect, the trial judge "shall submit the following three issues to the jury"— those being the "deliberateness," "future dangerousness," and, if raised by the evidence, "provocation" special issues. *Id.* art. 37.071(b). The State was required to prove each issue beyond a reasonable doubt, and the jury "shall return a special verdict of 'yes' or 'no' on each issue submitted." *Id.* art. 37.071(c). Then, "[i]f the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death." *Id.* art. 37.071(e). Thus, under then-existing Texas law, if the jury answered each of the statutorily required special issues affirmatively, the trial judge was required to sentence the defendant to death, regardless of whatever other, extra-statutory issues or questions might also be submitted to the jury. The sentence in a capital-murder case depended solely upon the answers to those three statutorily required special issues. *See Stewart v. State,* 686 S.W.2d 118, 124 (Tex.Crim.App.1984) (stating that "[o]ther than the provisions in Article 37.071, V.A.C.C.P., Texas jurisprudence has no authority allowing the submission of special issues to a jury in a criminal case").

Thus, any judicial efforts to comply with the Supreme Court mandate in *Penry I* also had to comply with the legislatively mandated procedure set out in article 37.071. Both the convoluted instructions rejected in *Penry II* and the present trial court's submission of the extra-statutory Question, coupled with an instruction to change a "Yes" answer to the first special issue to a "No" if the jury had answered the Question "No," were judicial attempts to comply with Texas statutory mandates as well as constitutional standards. *See generally, State v. McPherson,* 851 S.W.2d 846 (Tex.Crim.App.1992). In *McPherson,* this Court upheld the imposition of a life sentence when the jury in a capital-murder punishment stage answered the fourth, extra-statutory, special issue "No," reasoning that the Supremacy Clause required that the mandate of *Penry I* take precedence over the possible conflict with Texas statutory requirements. *McPherson,* 851 S.W.2d at 850. Judge Clinton, in his concurring opinion in *McPherson,* cogently set out the dilemma facing Texas judges at that time:

> After *Penry,* failure of a trial court to inform the jury that it could consider and give effect to mitigating circumstances violates rights of defendant under the Eighth Amendment and renders our capital punishment scheme mandated by former Article 37.071 unconstitutional....
>
> The judge of the court below manifested his understanding and appreciation of the situation when he caused the court to give the instruction and to submit the fourth special issue to the jury. And ... the trial judge also understood and appreciated the dilemma thus created by affirmative answers to statutory issues and the negative answer to the constitutional issue: on one horn, the statutory mandate that the trial court sentence appellant to death because the jury returned an affirmative finding on each of the only three legislatively prescribed special issues; on the other horn, the absence of an explicit statutory mandate to implement the implicit constitutional dictate that bars the State of Texas from executing appellant because the jury returned a negative finding on special issue four, i.e., that the death penalty is not a reasoned moral response to mitigating evidence favoring appellant.

*Id.* at 853 (Clinton, J., concurring).

tion, the jury was also instructed that if it could not answer the Question,[8] it should leave the answer line blank, and it should also "draw a single line through the word 'Yes' which you have previously written on your verdict form for Special Issue No. 1, leaving no answer for Special Issue No. 1." That is, if the jury could not answer the Question, it should return to the first special issue and cross out its "Yes" answer to that special issue. Although the jury was not informed of the effect of crossing out its answer to the first special issue, under article 37.071 the legal effect was that the defendant would be sentenced to life imprisonment, not death.[9] However, because the jury unanimously found that, despite its consideration of the mitigating evidence and applicant's level of culpability, "the penalty of death was the appropriate punishment," it never reached any issue of crossing out the "Yes" answer to the first special issue.

On direct appeal, applicant raised a *Penry I* claim and argued that the jury was not provided with "a proper jury instruction on how to apply mitigating evidence offered during trial[.]"[10] At trial, however, it was the State, not applicant, who objected to the submission of the Question and the accompanying instructions.[11] Applicant's "only objection to the charge as given was a general objection to the constitutionality of Article 37.071."[12] Applicant now contends that the Question and the instructions to the jury as to what it

should do if it answered the Question "No," compelled the jurors "to act dishonestly in order to give effect to mitigating evidence."

Neither we nor the trial court can consider the merits of that claim unless we first find that applicant's current application "contains sufficient specific facts establishing" that his claim is both cognizable under current constitutional law and was legally "unavailable" at the time he filed his original writ. Therefore, we turn to that question.

### III.

Section 5 of Article 11.071 of the Code of Criminal Procedure statutorily controls the authority of Texas state courts to consider new claims raised on any subsequent writ of habeas corpus in a death-penalty case. It states, in pertinent part:

(a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was un-

---

8. The jurors were instructed that they must be unanimous to answer the mitigation Question "Yes" and that at least ten jurors had to agree before they could answer the Question "No." If, after due deliberation, they could do neither, then they were not to answer the Question at all.

9. Tex.Code Crim. Proc. Art. 37.071(e) (Vernon 1990) ("If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas De-

partment of Corrections for life"). The statute addresses only the effect of answers to the statutory special issues "submitted under this article."

10. *Staley v. State,* 887 S.W.2d 885, 897 (Tex. Crim.App.1994).

11. *Id.* at 895 & n. 9.

12. *Id.*

available on the date the applicant filed the previous application;

. . .

(d) For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.

Under this legislative enactment, no Texas court is permitted to consider the merits of a subsequent writ claim unless the legal basis for that claim was "unavailable" at the time the applicant filed his original writ application. Section 5(d) defines an unavailable claim as one whose legal basis had not been "recognized by" or could not be "reasonably formulated from" a decision by the Supreme Court, the federal circuit courts, or this Court on the date the original (or any other previously considered) habeas writ application was filed in the convicting court. Thus, if applicant could have "reasonably formulated" his present claim from Supreme Court, federal circuit court, or this Court's precedent that existed when he filed his original writ application in 1997, we are barred, under Texas statutory procedures, from considering that claim in a subsequent writ.

Applicant claims that the punishment-phase jury instructions in his case were the functional equivalent of the constitutionally defective nullification instructions given in *Penry v. Johnson (Penry II)*,[13] *Tennard v. Dretke*,[14] and *Smith v. Texas*.[15] Applicant further asserts that these three Supreme Court decisions set out a new rule of law, and, therefore, his present claim was "unavailable" at the time he filed his initial habeas application. It was not until "[t]hese cases expressly held that the state and federal courts in Texas have repeatedly applied an improper legal standard in assessing *Penry* claims" that his claim concerning the Question and its jury instructions became available. He relies upon this Court's recent remand order in *Ex parte Robertson*[16] as support for his contention that he could not have formulated his present legal claim until this trio of cases was delivered by the United States Supreme Court.

The State, on the other hand, argues that applicant's claim is procedurally barred because the legal basis for that claim was "available" at the time he filed his first writ application in 1997. The State notes that, in fact, applicant did raise a *Penry* jury-charge claim in his direct appeal and it was rejected.[17] The State argues that, because applicant was able to recognize and raise a *Penry* claim on direct appeal in 1994, he cannot now complain that his claim was "unavailable" when he filed his first writ in 1997.[18]

13. 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

14. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

15. —— U.S. ——, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

16. *Ex parte Robertson*, AP–74,720, slip op. at 2 (Tex.Crim.App., March 16, 2005) (not designated for publication).

17. *Staley*, 887 S.W.2d at 897.

18. For this argument, the State relies upon *Selvage v. Collins*, 975 F.2d 131, 133 (5th Cir.1992) ("we have held that the unsuccessful advancement of *Penry* claims by defense counsel as early as 1980 demonstrates that such claims were reasonably available at that time").

The State also contends that, even if applicant's claim is considerably more narrow—"that the mitigation issue contained a prohibited nullification instruction in violation of *Penry II*"—that specific claim was also available before applicant filed his 1997 writ application. The State cites cases from this Court in which that issue had been raised by other capital-murder defendants in 1993 and 1994.[19] Accordingly, argues the State, "[w]here the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default."[20]

We need not, however, decide whether applicant's claim was legally available at the time he filed his original writ because we conclude that his application does not "contain sufficient specific facts establishing that" his claim is cognizable even if *Penry II*, *Tennard*, and *Smith* created a new and previously unavailable legal claim.

■ Under both Article 11.07 and Article 11.071, an original or subsequent application for a writ of habeas corpus must state specific, particularized facts which, if proven true, would entitle him to habeas relief.[21] These facts must be sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry. That is, the facts must establish a cognizable claim based on formerly "unavailable law." Thus, it is not sufficient to allege that a legal claim was unavailable at the time of the applicant's original filing if the facts alleged in the subsequent application do not bring the constitutional claim under the umbrella of that "new" legal claim. For example, *Ring*[22] and *Apprendi*[23] may

---

19. *See Coble v. State*, 871 S.W.2d 192, 207 & n. 18 (Tex.Crim.App.1993) (rejecting defendant's claim that "nullification" jury instruction did not provide an adequate means to give effect to mitigating evidence and noting that defendant had objected to instruction "claiming it shifted the burden of proof to appellant to establish mitigating evidence, it was confusing and did not give the jury a clear means to give mitigating effect to any mitigating circumstances, and it violated the jury's oath to answer the special issues truthfully"); *Robertson v. State*, 871 S.W.2d 701, 710–11 (Tex.Crim.App.1993) (rejecting defendant's contention that "nullification" instruction was insufficient vehicle to avoid the constitutional infirmity in *Penry*); *see also Bigby v. State*, 892 S.W.2d 864, 890 (Tex.Crim.App. 1994) (rejecting defendant's claim that "nullification" instruction did not satisfy commands of *Penry*); *Wheatfall v. State*, 882 S.W.2d 829, 840–41 (Tex.Crim.App.1994) (rejecting defendant's claim that "nullification" instruction "calls for the jurors to act against their natural inclinations by asking them to alter one of their answers to the special issues").

20. *Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Smith v. Murray*, 477 U.S. 527, 536–37, 106

S.Ct. 2661, 91 L.Ed.2d 434 (1986) (rejecting applicant's contention that he was entitled to rely on the novelty of his constitutional claim as a sufficient cause for his failure to raise that issue in his direct appeal; stating that "the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all" and noting that "various forms of the claim he now advances" had been percolating in lower courts for years before the time of procedural default).

21. *See Ex parte Sowell*, 956 S.W.2d 39, 40 (Tex.Crim.App.1997) (*per curiam*) (consideration of merits of subsequent writ filed under art. 11.07 barred when applicant failed to include "sufficient specific facts establishing" one of the exceptions to § 4).

22. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

23. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

have been delivered after a death-row inmate had filed his original writs. That law was unavailable at the time of the original filing, but we have already held that *Ring* and *Apprendi* do not require the State, in a death-penalty case, to bear the burden of proving beyond a reasonable doubt that the mitigation issue should be answered in the negative.[24] Thus, a subsequent writ based upon a *Ring* or *Apprendi* claim alleging that the State failed to disprove the mitigation issue beyond a reasonable doubt does not contain "sufficient specific facts establishing" a cognizable constitutional claim based upon formerly "unavailable" law. Similarly, a death-row inmate may file a subsequent writ application based upon the newly available legal claim of mental retardation under *Atkins v. Virginia*,[25] but if his application states that his I.Q. has repeatedly been tested at 120–130, he has failed to state sufficient specific facts establishing a cognizable claim under *Atkins*. We turn, then, to the question of whether the specific facts alleged in applicant's subsequent writ—the wording of the punishment jury charge—establish a cognizable constitutional claim based on formerly "unavailable" law.

■ The jury charge in applicant's trial, unlike the jury instructions in *Penry II, Tennard,* and *Smith,* contained a fourth special issue, the Question, which focused exclusively upon mitigating evidence. In this case, the jury was specifically asked whether the mitigating evidence and jury's assessment of applicant's moral culpability raised any reasonable doubt as to whether the death penalty was the appropriate punishment. Here, before the jury could ever even consider any "nullification" action, it was asked an affirmative, highly focused question: After considering any and all mitigating evidence and the applicant's level of culpability, his character, background, and the circumstances of the offense, is the penalty of death the appropriate punishment? With its "Yes" answer, the jury unanimously found, beyond a reasonable doubt, that death was the appropriate penalty. This jury, therefore, was clearly and unequivocally capable of giving effect to mitigating evidence in its answer to the Question. The "nullification" problem identified in *Penry II* never came into play because the jury had already explicitly found that, regardless of any and all mitigating evidence, death was the appropriate punishment. In *Penry II,* the Supreme Court held that "the key under *Penry I* is that the jury be able to 'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'"[26] In *Penry II,* the Supreme Court disapproved of an instruction that the jury simply "nullify" special issues within a verdict form rather than specifically consider mitigation evidence on its own merits.[27]

---

24. *Paredes v. State,* 129 S.W.3d 530, 541 (Tex. Crim.App.2004); *Resendiz v. State,* 112 S.W.3d 541, 550 (Tex.Crim.App.2003).

25. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

26. *Penry II,* 532 U.S. at 797, 121 S.Ct. 1910 (quoting *Penry I,* 492 U.S. at 319, 109 S.Ct. 2934).

27. In *Penry II,* the Supreme Court stated:
We generally presume that jurors follow their instructions. Here, however, it would have been both logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give

That problem simply does not exist in this case. Although the constitutional concerns set out in *Penry II* could have arisen in this case had the jury answered the Question with "No," it did not do so. Any claim that the jurors would have faced a dilemma in answering the first special issue "falsely" simply to give effect to applicant's mitigating evidence never arose. There is no reasonable likelihood that the jury in this particular case was, in fact, faced with the dilemma denounced in *Penry II, Tennard*, or *Smith*.

■ A habeas applicant cannot establish a constitutional violation simply by demonstrating that an allegedly erroneous jury instruction could have or might have affected some hypothetical jury. As the Supreme Court explained in *Boyde v. California:*[28]

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and ac-

curacy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. . . . Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely[29] to prevail over technical hairsplitting.

The simple, commonsense understanding of the Question and the jury's unanimous "Yes" response to the Question compel us to conclude that the jury could and did have an adequate vehicle to express its consideration of applicant's mitigating evidence. Only if we could conclude that a reasonable jury would have falsely answered the fourth special issue with a "Yes" response—even though it had found that the mitigating evidence raised a reasonable doubt that the death penalty was the appropriate punishment—because it was unwilling to "falsely" change its answer to the first special issue could we conclude that this special issue and the accompanying instructions are covered by and possibly infirm under *Penry II, Tennard*, and *Smith*. Therefore, we hold that,

---

effect to the mitigating evidence would have had to violate their oath to render a "true verdict."

The mechanism created by the supplemental instruction thus inserted "an element of capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty dependent on their willingness" to elevate the supplemental instruction over the verdict form instructions. There is, at the very least, "a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevented

the consideration" of Penry's mental retardation and childhood abuse. The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence.
*Penry II* at 799–800, 121 S.Ct. 1910 (citations omitted).

**28.** 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990):

**29.** *Id.* at 380–81, 110 S.Ct. 1190.

as a matter of Texas statutory law, this subsequent application does not contain "sufficient specific facts" that establish that applicant's current claim is cognizable under the *Penry II*, *Tennard*, and *Smith* line of cases even if we were to decide that this trio of cases created a new legal claim that was unavailable on the date applicant filed his previous writ application.[30] Under Texas statutory law, we are barred from considering the merits of applicant's subsequent writ.[31]

We therefore dismiss the present application for a writ of habeas corpus under Article 11.071, § 5(a)(1), and lift the stay of execution previously entered by this Court on March 23, 2005.

PRICE, J., filed a dissenting statement in which HOLCOMB, J., joined.

WOMACK, J., dissented.

PRICE, J., filed a statement dissenting to the dismissal of the application, in which HOLCOMB, J., joined.

### STATEMENT

The applicant filed a subsequent application for a writ of habeas corpus seeking relief from his capital murder sentence on the basis that the mitigation instruction submitted to the jury in his case violated the Eighth Amendment to the United States Constitution. The majority concludes that the applicant has not met the requirements of Article 11.071 Section 5.

Because I disagree with the majority's conclusion, I respectfully dissent.

Under the circumstances of this case, Article 11.071 requires that the applicant present sufficient specific facts establishing that the claim is cognizable and was legally unavailable. The majority disposes of the application by dismissing it on the basis that the applicant has not met section 5. It concludes that the jury in this case was not presented with the same nullification problem as the jury in *Penry II*.[1]

There is no functional difference between the instruction given in this case and the instructions that the Supreme Court held to be unconstitutional in *Penry II*. The jury was instructed to render a true verdict and was also instructed to change its true verdict under certain circumstances. The trial court submitted to the jury a mitigation question.

> Do you find from the evidence beyond a reasonable doubt, after considering all mitigating evidence, if any there be, and considering the defendants level of culpability, character and background and the circumstances of the offense, that the penalty of death is an appropriate punishment?

The jury was instructed that if it answered the mitigation question no, it should cross out its yes answer to special issue number one and write no. It was also instructed that if it could not reach a verdict on the mitigation question, it should also cross out its answer to special issue 1.[2]

---

**30.** Tex.Code Crim. Proc. art. 11.071, § 5(a)(1).

**31.** We also need not address the question of whether, under Texas state law, applicant procedurally defaulted this claim by failing to make a contemporaneous objection in the trial court to the "nullification" instructions accompanying the Question. *See, e.g., Ex parte Smith*, 132 S.W.3d 407, 423–24 (Tex.Crim. App.2004) (Hervey, J., concurring) and *id.* at 428 (Holcomb, J., concurring), *rev'd on other*

*grounds sub nom Smith v. Texas*, —— U.S. ——, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

**1.** *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

**2.** It is not relevant that the instructions may have been more favorable to the applicant in some aspects. The only relevant question for our purposes is whether the instructions

The fact that the jury answered the mitigation question yes does not end the inquiry. During voir dire, the State explained the process to the venire members. Here is an example of an exchange between the State and one of the venire members:

> [State] And then after you consider all this evidence, the Court will tell you that if you believe from all the evidence that the mitigating evidence— the stuff that you think, it in your own mind, lessens the [appellant's] personal moral culpability, you think there's enough of that, that you believe that he should be spared the death penalty, even though you've decided the answer to all these questions is yes, that you would be instructed that you were then under an obligation to answer two [sic] or more of the questions no.
>
> [Answer] To be instructed to answer them no?
>
> [State] Yes. Because you would believe that the personal, moral culpability of the [appellant] of the defendant was lessened by this mitigating evidence that you had heard to the point where, in this case, that he deserved the death penalty, okay?
>
> [Answer] Okay.
>
> [State] And under the circumstances, then, you would be told to answer one or more of those questions no, even though by the explicit terms the answer was yes. And you see the result of answering it no if ten or more of you agreed that the answer was no would be life instead of death. Do you see that?
>
> [Answer] That's right.

caused the applicant to be sentenced in violation of the Eighth Amendment.

Venire members were told that they would be required, under certain circumstances, to change their true verdict on one or more of the special issues if they found that the mitigating evidence warranted a sentence other than death. The seeds of the internally inconsistent jury charge were planted during voir dire.

One conclusion that we can reach is that the jury reached its answer to the mitigation question because it gave effect to its reasoned moral response to the evidence. This is not the only conclusion we can reach based on this record. It is also possible that the jurors answered the mitigation yes to avoid violating its oath to render a true verdict. We cannot know. Under these circumstances, we cannot be reasonably certain that the nullification problem never came into play.

In this case, the majority does not address whether the claim was legally unavailable or whether the claim was procedurally defaulted, but I address these questions in the interest of a full hearing of the applicant's claims. The applicant claims that *Penry II* was unavailable when he filed his initial application under Article 11.071. His initial application was filed on October 14, 1997. The Supreme Court delivered *Penry II* in 2001. By the time the applicant filed his initial application, we had held that jury nullification instructions met the constitutional requirements announced by the Supreme Court in *Penry I*.[3]

In fact, the applicant raised this claim on direct appeal, though it was not directly addressed in our opinion affirming his conviction. In his brief on direct appeal, the appellant argued that the trial court erred in submitting the mitigation question to the jury.

3. *Fuller v. State*, 829 S.W.2d 191, 209 (Tex. Crim.App.1992), *cert. denied* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993).

The trial court in this case concocted an instruction which instructs the jury to ignore their oath and answer a submitted question falsely if they want to show mercy. The instruction is irrational and contradictory but better than nothing in the charge to guide the jury's consideration.... Although it was a noble attempt at judicial legislation, the instruction failed to allow meaningful consideration of the factor's in [the appellant's] trial.

In response to this argument, we said only that, "The jury answered the question in the affirmative. This 'fourth special issue' is sufficient to meet the commands of *Penry*."[4] The claim was presented before, and we summarily disposed of it because we did not have the benefit of *Penry II*.

The State claims that the applicant procedurally defaulted his claim because his trial counsel did not object to the jury charge on this basis at trial. First, I would say that this was not an issue in *Ex parte Smith*[5] to the majority of this Court. Although the concurring judges would have ruled on this basis, the majority addressed the merits of the claim.[6] Also, the fact that Smith did not object at trial was not considered by the United States Supreme Court when it granted relief.[7]

Moreover, the State's objection to the charge made the trial court aware of the problem with the charge. One of the main purposes of a timely and specific objection is to make the trial court aware of the objection so that it may rule on it.[8] That purpose was satisfied in this case.

I want to make one final point. I have no doubt that the trial court in this case was trying to make the best of a bad situation. The Supreme Court had delivered *Penry I*, but the legislature had not yet provided for a procedure to incorporate the requirements of the decision. And at the time, Article 37.071 required the trial court to impose a death sentence if the jury answered the special issues in a certain way. There was no room for the trial court to simply add another question without also directing the jury to change its answer to one of the special issues. The trial court was definitely caught between a rock and a hard spot. I think we can all agree that the trial court did its best under these difficult circumstances.

I disagree with the majority's conclusion that the applicant has not met the requirements of Article 11.071, Section 5. I respectfully dissent.

---

4. *Staley v. State*, 887 S.W.2d 885, 897 (Tex. Crim.App.1994).

5. *Ex parte Smith*, 132 S.W.3d 407, 417 (Tex. Crim.App.2004).

6. *Ibid.* (Hervey, J., concurring); *id.*, at 428 (Holcomb, J., concurring).

7. *See Smith v. Texas*, —— U.S. ——, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004).

8. *Garza v. State*, 126 S.W.3d 79, 82 (Tex.Crim. App.2004).