

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NOS. WR-17,425-03 & WR-17,425-06

### EX PARTE CESAR ROBERTO FIERRO, Applicant

### ON APPLICATIONS FOR WRITS OF HABEAS CORPUS
### IN THE 120TH DISTRICT COURT
### EL PASO COUNTY

**KEASLER, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

We filed and set Applicant Cesar Roberto Fierro's fourth subsequent (-06) postconviction habeas application to determine whether we may consider, and potentially grant relief on, either of the claims raised therein. First, Fierro claims that his capital-murder conviction was contaminated by the State's unknowing use of false evidence. Because we conclude that Fierro has failed to make a *prima facie* showing of a due-process violation under *Ex parte Chabot*,[1] we will dismiss this claim as subsequent.

Second, Fierro contends that his death sentence resulted from constitutionally

---

[1] *See Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009).

inadequate jury instructions in violation of the Eighth Amendment and the decisions of the United States Supreme Court in *Penry v. Lynaugh* and its progeny.[2]  Rather than address this claim as presented in the -06 application, we think it appropriate to re-open Fierro's -03 habeas application, in which he raised a substantively identical claim, and grant relief in the form of a new punishment proceeding.  We ultimately vacate Fierro's death sentence and accordingly dismiss the present-day *Penry* claim as moot.

## I.  FACTS

### A.  Trial.

This case arises from the 1979 robbery-murder of El Paso cab driver Nicolas Castanon.  As recounted in our original opinion on direct appeal, here are the facts.  For clarity's sake, we have changed every reference to "the appellant" to instead say simply, "Fierro."

> On February 27, 1979, the body of Nicolas Castanon . . . was discovered in Modesto Gomez Park in the city of El Paso.  Castanon had a bullet wound in his head behind the right ear and another bullet wound in his shoulder.

> The taxicab which Castanon had been driving was discovered across the international border in Juarez, Mexico, with bloodstains in the front seat and carpet.  His jacket was discovered on the grounds of Bowie High School on a road leading from Modesto Gomez Park to Juarez.

> The cause of death was shown by autopsy to have been the bullet wound behind the right ear which fractured the first vertebra and the base of the skull and compressed the medulla oblongata.  This stopped respiration and

---

[2]  *See Penry v. Lynaugh*, 492 U.S. 302, 328 (1989).

caused almost instantaneous death. It was estimated that the shot had been fired from no more than 15 inches away. The bullet fragment recovered revealed the deceased had been shot by a .357 Magnum or a .38 caliber Special. No valuables were found on the body.

Some months later on July 31, 1979, Geraldo (Jerry) Olague, age 16, personally contacted El Paso police officers. His written statement to the police led to the arrest of Fierro. The officers took Olague to Juarez where he pointed out the residence of Fierro's mother and stepfather.

At trial Olague testified he was with Fierro at the time the deceased was shot. Olague revealed that about 2:15 a.m. on February 27, 1979, he and Fierro were together in front of the El Paso Public Library. Olague hailed a taxicab to go home. The taxi driver was Castanon. After he stopped, Olague got in the front seat and Fierro got in the back seat. Fierro told Olague that after Olague was taken home he would go to his home in Juarez. Olague requested Castanon to take him to 226 Wooldridge where he lived. As they neared the location Olague heard Fierro yell "stop" and as Castanon turned Fierro shot him in the back of the head. Castanon fell into Olague's lap leaving blood on Olague's pants. The taxicab jumped the curb and ran into a yard, but Olague hit the brake and the engine died. Olague was surprised and scared. Fierro told him to get into the back seat. Fierro got behind the wheel. Olague remembered asking Fierro why he shot Castanon, but he could not recall Fierro's response.

Fierro drove to Modesto Gomez Park. Fierro removed Castanon from the cab and dragged him some distance and then shot Castanon again, and took Castanon's wallet[,] watch[,] and jacket. Olague stated Fierro used the jacket to wipe up some blood and threw the jacket out along the road they took to Juarez. The watch was discarded in a dumpster. After reaching Juarez, the taxicab was abandoned and Fierro and Olague went to the home of Fierro's mother. Olague revealed that when the television news told of the murder Fierro laughed. Later Fierro and Olague went into the interior of Mexico where Fierro sold his .357 Magnum to a rancher. Olague then went to visit his father in Mexico, but Fierro later checked on him by telephone and warned him not to tell of the incident. After some months, Olague returned to El Paso and went to the police.

Fierro's written extrajudicial confession was also introduced into evidence. It was very similar to the details related by Olague. Fierro stated he

had a .357 Magnum which had been stolen by his brother, that he shot the deceased and drove the automobile to a small park. After Olague dragged the body out of the cab, Fierro admitted he shot the deceased and took his watch. He stated he later threw the watch into a trash can on the way to Juarez.[3]

At trial, Fierro argued that his confession was coerced. The details of that claim are not entirely relevant here. Suffice it to say that, at trial, El Paso Detective Al Medrano (among other witnesses) denied that Fierro's confession was coerced. Based in part on Medrano's testimony, the trial judge found that Fierro had "voluntarily given the confession after being duly warned of his rights, and that [the confession] was obtained without use of force, threats, promises or coercion."[4] The jury found Fierro guilty of capital murder.

## B. Direct appeal and prior postconviction litigation.

On direct appeal, among other things, Fierro reasserted that his confession was the product of coercion. We affirmed the trial judge's ruling, observing that the testimony and evidence in the record supported the trial judge's findings of fact.[5] We ultimately rejected all of Fierro's other claims on direct appeal and affirmed the trial court's judgment.[6]

In his -01 writ, Fierro raised three claims that are not relevant here. Fierro's -02 "writ" was actually a motion for stay of execution. In his -03 writ, Fierro claimed that the

---

[3] *Fierro v. State*, 706 S.W.2d 310, 311–12 (Tex. Crim. App. 1986) (alterations noted in the text of this opinion).

[4] *Id.* at 316.

[5] *Id.*

[6] *Id.* at 320.

jury sentencing him to death "was precluded from considering and giving effect to mitigating evidence presented in his trial." This claim was based on the Supreme Court's 1989 ruling in *Penry v. Lynaugh*.[7] We will describe this claim in more detail later in this opinion. For the time being, suffice it to say that we denied this claim.

In his -04 writ application, Fierro raised a number of claims, the gist of which were that the State violated his right to due process when it elicited, and failed to correct, testimony it knew to be false. Specifically, Fierro claimed that Detective Medrano perjured himself when he denied having coerced Fierro's confession. We remanded Fierro's application to the convicting court for fact development. The habeas judge found that Medrano had indeed given false testimony on certain details of Fierro's confession, and concluded that there was a "strong likelihood that [Fierro's] confession was coerced."[8] We held that the habeas judge's findings were "adequately supported," and we agreed with the habeas judge that Fierro's due-process rights were violated by the State's knowing use of false evidence.[9] However, relying on Olague's testimony and our assessment of his credibility at trial, we nevertheless concluded that the violation was harmless.[10]

Fierro filed his last writ application, the -05 writ, in March 2005. In it, he raised a

---

[7] *See Penry*, 492 U.S. at 328.

[8] *Ex parte Fierro*, 934 S.W.2d 370, 371 (Tex. Crim. App. 1996).

[9] *Id.* at 371–72.

[10] *Id.* at 374–76 & n.13.

single claim, the substance of which is not relevant here. That brings us to the instant application.

### C. Present litigation.

Fierro's instant application, the -06 writ, raises two claims. First, Fierro claims that the State violated his right to due process by unknowingly sponsoring false evidence. Specifically, Fierro undertakes to show that, unbeknownst to the State, several aspects of Geraldo Olague's testimony were materially false. This claim is based on our 2009 decision in *Ex parte Chabot*, in which we said that due process can be violated when the State "unknowingly present[s] perjured testimony."[11]

In his second claim, Fierro reasserts his *Penry* challenge. He argues that legal developments occurring after his 2005 writ place his longstanding *Penry* challenge on stronger analytical footing.[12] Thus, Fierro contends that the present *Penry* challenge is not simply a naked attempt to relitigate a settled issue; it is instead based on law that was "unavailable at the time of Fierro's prior [2005] application." Because we are re-opening Fierro's -03 writ and granting relief on that *Penry* claim, we need not decide whether the present-day *Penry* claim satisfies Code of Criminal Procedure Article 11.071, Section 5.

## II. CLAIM ONE: OLAGUE'S TESTIMONY WAS MATERIALLY FALSE.

### A. What is required of a subsequent-writ claim.

---

[11] *See Chabot*, 300 S.W.3d at 711.

[12] *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007); *Brewer v. Quarterman*, 550 U.S. 286, 289–90 (2007); *Smith v. Texas*, 550 U.S. 297, 316 (2007).

For a subsequent-capital-writ applicant to receive merits review of a claim, one of the three exceptions to the subsequent-writ bar in Article 11.071, Section 5 must be met.[13] Fierro invokes only the exception made for new and previously unavailable legal bases. So in Claim One, Fierro argues that his *Chabot* claim could not have been presented in an earlier habeas application because his last application was filed in 2005 and *Chabot* was not decided until 2009.

In *Ex parte Chavez*, another subsequent-writ case, we said that unknowing-use-of-false-evidence claims, at least as we have come to apply them in Texas, were legally unavailable before *Chabot* and its progeny.[14] We purported to reach the merits of Chavez's *Chabot* claim.[15] In light of *Chavez*, we agree with Fierro that his *Chabot* claim was unavailable in March 2005. But that does not end the analysis.

Under Articles 11.07 and 11.071, an original or subsequent application for writ of habeas corpus must state specific facts which, if proven true, would entitle the applicant to relief.[16] These facts must be sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry.[17] So it is not enough for the

---

[13] *See* TEX. CODE CRIM. PROC. art. 11.071, § 5(a).

[14] *See Ex parte Chavez*, 371 S.W.3d 200, 206–07 (Tex. Crim. App. 2012).

[15] *Id.* at 207.

[16] *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005) (citations omitted).

[17] *Id.*

applicant to allege that a certain legal claim was "unavailable" at the time of an earlier filing if the facts he alleges in support of his subsequent application would not merit relief under the newly available law.[18] To receive merits review of a claim based on previously unavailable law, the applicant must make a *prima facie* showing that, if the facts he alleges are true, the previously unavailable law would afford him some relief.[19] If he does not, the claim should be dismissed as subsequent.[20]

**B. What is required of a *Chabot* claim.**

For a litigant to prevail on a claim that the State violated his due-process rights by unknowingly using false evidence, the litigant must show two things. First, he must establish by a preponderance of evidence that the evidence he complains of was indeed "false," in the sense that it left the factfinder with a "misleading or false impression after considering the evidence in its entirety."[21] Second, the litigant has the burden to demonstrate, again by a preponderance of evidence, that this evidence was "material."[22] In conjunction with the subsequent-writ pleading requirements outlined above, this means that Fierro must make a *prima facie* showing of both falsity and materiality if he is to receive merits review of his

---

[18] *Id.*

[19] *See Ex parte Oranday-Garcia*, 410 S.W.3d 865, 867–68 (Tex. Crim. App. 2013) (citing *Staley*, 160 S.W.3d at 63–64).

[20] *Id.* at 867, 869.

[21] *Ex parte Chaney*, 563 S.W.3d 239, 263 (Tex. Crim. App. 2018).

[22] *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014).

*Chabot* claim.[23]

We have not definitively said whether the materiality standard in unknowing-use-of-false-evidence claims is the same as the materiality standard in knowing-use-of-false-evidence claims. We have strongly suggested that those standards are the same,[24] but we have never expressly said as much.[25] In an abundance of caution, we will assume in Fierro's favor that those standards are the same. Under this assumption, Fierro must show that there is a "reasonable likelihood" that, but for the State's reliance on false evidence, his capital murder trial would have ended in an acquittal.[26] We will also assume in Fierro's favor that his confession should not be used against him in the materiality analysis.[27] Finally, although we will discuss each alleged falsehood sequentially, for materiality purposes we will consider

---

[23] *E.g.*, *Chavez*, 371 S.W.3d at 220–21 (Price, J., dissenting).

[24] *Compare Chavez*, 371 S.W.3d at 206–07 ("The present standard for materiality of false testimony is whether there is a reasonable likelihood that the false testimony affected the applicant's conviction or sentence.") (internal quotation marks omitted), *with Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011) ("The knowing use of false testimony violates due process when there is a reasonable likelihood that the false testimony affected the outcome.") (internal quotation marks omitted).

[25] *See, e.g.*, *Ex parte Lalonde*, 570 S.W.3d 716, 727 (Tex. Crim. App. 2019) (Keller, P.J., concurring) ("This Court has not been clear about the materiality standard that applies to the unknowing use of false evidence[.]") (internal quotation marks omitted).

[26] *See id.* at 722 (quoting *Weinstein*, 421 S.W.3d at 665).

[27] *Cf. Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1996)) (noting that, in other due-process contexts, materiality is "considered collectively, rather than item-by-item").

their cumulative impact.[28]

### C. Fierro's *Chabot* claim.

By our count, Fierro identifies at least nineteen falsehoods that he contends had an impact on the jury's decision to convict him of capital murder. Fierro presents these falsehoods in two parts, each of which contains at least one subpart.

#### 1. "Olague falsely portrayed himself as a passive non-participant under the sway of Fierro."

Part One of Fierro's *Chabot* claim seeks to establish that, contrary to the relatively innocent image he painted at trial, Olague either was peripherally involved in, actively assisted in, or directly committed, the murder of Nicolas Castanon. Fierro organizes Part One under three subparts.

In the first subpart, Fierro tries to show that Olague testified falsely regarding "the details of the murder" itself. Second, Fierro attempts to show that Olague testified falsely regarding "the events described as transpiring at Modesto-Gomez Park." Third and finally, Fierro alleges that Olague testified falsely regarding "his association with Fierro, and their travels to and within Mexico."

##### a. "Olague testified falsely regarding the details of the murder."

The first alleged falsehood in this subpart is Olague's testimony that, when Fierro shot

---

[28] *Cf. Kyles*, 514 U.S. at 436 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality[.]").

the victim from the back seat of the taxi, Olague (who was sitting in the front passenger seat) did not hear any "loud noise." To show that this testimony was false, Fierro provides an affidavit from Edward Hueske, an expert whose professional focus is "crime-scene reconstruction and related forensic analysis." Hueske explains that the gun allegedly used in this murder would have produced a deafening roar—such that anyone sitting in the front seat, mere feet away from the blast, would have experienced "significant pain."

Fierro seems to think that when Olague denied hearing a loud noise, Olague was referring to the gunshot. The record shows otherwise. Olague testified that after Castanon was shot, the cab drifted and then ran up onto a curb. As he was being cross-examined on this point, the following exchange occurred:

Q. Was there a loud noise by the cab?

A. Well, I just heard the bullet and just a little bit. That's all.

Q. It wasn't a loud noise?

A. No, sir.

As we understand his testimony, Olague was not trying to convince defense counsel that the gunshot was quiet. Instead, we understand Olague to be answering the question he was asked—whether there was a loud noise "by the cab" when it ran up onto the curb. In light of this, Hueske's gunshot-volume analysis is simply inapposite. Fierro therefore fails to make a *prima facie* showing of falsity on this point.

The second alleged falsehood is Olague's claim that, after the fatal shot, Castanon's

body slumped toward the passenger seat and fell into Olague's lap. Then, "[a]ccording to Olague, he put the brakes on using his left foot, bringing the cab to a stop." Again referring to Hueske's affidavit, Fierro describes this account as implausible. But even if Hueske is right that it would have been difficult for Olague to maneuver the car in that manner, that does not mean that Olague's account was false. To say that something is difficult is not to prove that anyone claiming to have witnessed the feat is lying, or that a jury listening to an account of the feat was misled. With this in mind, we conclude that Fierro has failed to make a *prima facie* showing of falsity on this point.

The third alleged falsehood is Olague's testimony that, after the taxi came to a stop, Fierro got out of the backseat, shoved the victim's body over, told Olague to sit in the backseat, and drove away. Referring again to Hueske's affidavit, Fierro argues that this account as similarly "implausible." But here again, that is a far cry from proof that Olague misled the jury. For the same reason as before, we conclude that Fierro has failed to make a *prima facie* showing of falsity.

In the final portion of this subpart (fourth falsehood overall), Fierro argues that Olague's account must have been false because it involved "several loud, and potentially alarming, events which would have transpired in rapid succession." Fierro then offers affidavits from "residents in the area where Olague claimed the shooting took place." Each of these residents swears that they did not hear any loud noises on the night in question.

But a handful of affiants saying that they did not hear anything does not prove that

there were no noises in the area. It proves only that, if there was a noise, those affiants did not hear it. So, once again, we find that Fierro has failed to make a *prima facie* showing that Olague's testimony was false. Even if these affidavits were found credible, they would not establish by a preponderance of evidence that the jury was misled.

### 1-b. "Olague testified falsely regarding the events described as transpiring at Modesto-Gomez Park."

The fifth alleged falsehood is Olague's statement that Fierro drove the taxi to Modesto-Gomez Park with his left hand and held up the victim's dead body with his right hand. Fierro refers again to Hueske's affidavit to explain that this would have been an "extraordinarily difficult" task for Fierro. Once again, Fierro fails to distinguish between difficulty and falsity. Fierro has not made a *prima facie* showing of falsity on this point.

The sixth alleged falsehood is Olague's claim that, after Fierro moved the victim's body to the front passenger seat of the cab, Olague moved from the front seat into the right rear seat. Fierro argues from the forensic evidence and Hueske's affidavit that "anyone seated in the right rear area of the cab during the drive to Modesto-Gomez Park would have had their shoes immersed in blood." He then points out that no bloody footprints were discovered at Modesto-Gomez Park. Therefore, "Olague could not have been sitting in the back right seat, as he claimed." But that does not follow.

There are any number of reasons why, despite sitting in the back right seat, Olague might have avoided getting blood on his shoes. Olague could have deliberately kept his feet off the floor. He could have angled his legs into the adjoining footwell. He could have had

his feet up on the seat. We conclude that Fierro has failed to make a *prima facie* showing that Olague testified falsely in this regard.

The seventh alleged falsehood is Olague's testimony that, after Olague and Fierro arrived at Modesto-Gomez Park, Fierro dragged the victim's body up a hill and shot it a second time. Specifically, Olague tentatively testified that the victim's body was face up when it was shot. Fierro now undertakes to show that the body must have been face down when it was shot. But on cross examination, Olague equivocated about whether the body was face up or face down: "I can't remember . . . I saw everything, but I didn't know how the body was laying or anything." In light of this equivocation, Fierro cannot show by a preponderance of evidence that the jury was left with a false or misleading impression.

The eighth alleged falsehood is Olague's (similarly tentative) statement that the postmortem shot was fired at "close range." Fierro notes that a 1979 FBI analysis failed to detect gunshot residue on a cutting of the victim's shirt. This, Fierro says, shows that Olague's account was false. But on the witness stand, Olague did not explain what exactly he meant by "close range." Indeed, when he was first asked about it, Olague simply answered "yes" to the prosecutor's leading question, "Was that a fairly close range?" Furthermore, the FBI's report did not definitively conclude that the postmortem shot was fired at a longer distance—only that the "absence of [gunshot] residues precludes any muzzle-to-garment distance determination." Fierro cannot show that the jury was left with a false or misleading impression.

### 1-c. "Olague testified falsely regarding his association with Fierro, and their travels to and within Mexico."

The ninth alleged falsehood is Olague's testimony that, after he and Fierro left the victim's body at Modesto-Gomez Park, they drove to Juarez, Mexico through the Santa Fe Bridge. Fierro offers evidence that the Santa Fe Bridge "is now, and has historically been, a one-way bridge from Juarez to El Paso." Here, Fierro has failed to make a *prima facie* showing of materiality. There is simply no reasonable likelihood that if the jury were informed that Olague and Fierro actually took a different route into Juarez, the outcome of Fierro's trial would have been different.

The tenth alleged falsehood is Olague's testimony that, while he and Fierro were in Mexico, Fierro sold the murder weapon—a .357 Magnum pistol—to a worker at "Carrillo Ranch." To show that this testimony was false, Fierro presents an affidavit from a person named Juan de Santiago Contreras. Contreras claims that he went with Fierro and Olague to Carrillo Ranch. Contreras says that, before they left, Olague showed him some of the things he planned to sell: "some jewelry, some clothing, some radios . . . some cameras, and a gun." Contreras adds,"It was a beautiful gun – I really liked it. Olague told me that it was a .357 Magnum. Olague told me that he had stolen the gun." He continues:

> From San Jose, we went to the Carrillo ranch in Zacatecas, Mexico. There, I saw a man I knew, Tereso Gutierrez. We talked with Mr. Gutierrez at the Carrillo ranch. Olague asked him if he wanted to buy a gun for 5,000 pesos. Mr. Gutierrez said that this price was too high, and offered Olague a lower price. I think he offered about 4,000 pesos. Olague said that he would take the money. Mr. Gutierrez handed Olague the money, and Olague put it in his pocket. He did not share any of the money with me or with [Fierro]. Olague

handed the gun to Mr. Gutierrez.

Fierro seems to assume that the gun Contreras describes was actually the murder weapon. But to prove that Olague's testimony was false, Fierro has the burden to demonstrate that fact by a preponderance of evidence. And, given the age of Contreras' affidavit (it was notarized in 1994), we have serious doubts that Fierro could meet this burden, even with further fact development. But we need not resolve this particular allegation on that basis.

Even if Olague misrepresented who sold the murder weapon, that does not prove much, and it certainly does not prove that Olague was an accomplice to the murder of Nicolas Castanon. In this case, the jury was charged as follows:

> 'An accomplice,' as the term is used here, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before, or during the time of the commission of the offense[.]

Under this definition, even if Olague sold the murder weapon himself, he was not an accomplice to capital murder. The weapon was sold well after the capital murder was consummated. In view of this, we conclude that, had the jury been made aware of Contreras's alternate version of events, there is no reasonable likelihood that it would have viewed Olague as an accomplice to capital murder. Nor do we think that the discrepancy between Contreras's account and Olague's account would have caused the jury to reject Olague's account in its entirety. We ultimately conclude that this discrepancy was immaterial. Fierro has therefore failed to make a *prima facie* showing of a due process

violation.

The eleventh alleged falsehood is Olague's assertion that a man named Mariano Burciaga drove Olague and Fierro from Juarez to Chihuahua, Mexico. Strictly speaking, Olague did not identify Burciaga by name from the witness stand. But, even assuming that the jury was left with a false or misleading impression, we ultimately conclude that this evidence was immaterial. The identity of the person who chauffeured Fierro and Olague to the train station in Chihuahua was not a remotely important aspect of the trial. Fierro has failed to make a *prima facie* showing of materiality.

The twelfth alleged falsehood is Olague's claim that he decided to turn Fierro in on the advice of a man named Eliazar Casillas, who Olague asserted was studying to be a lawyer. Fierro presents evidence that Casillas actually studied "agriculture and animal husbandry" and that he "never studied the law." But as with Burciaga, Olague did not identify Casillas by name from the witness stand. And, even assuming that Olague left the jury with a misleading or false impression, we conclude that this aspect of Olague's testimony was not even minimally material.

> **2. "Olague's testimony gave the jury a false impression of his mental health, his violent nature, and his criminal propensity.**"

>> **2-a. "Olague's mental health issues are lifelong and were not simply transitory or induced by fear, as suggested at trial."**

This part and subpart contain at least seven alleged falsehoods, each of which deal with Olague's violent past and mental instability. The gist here is that (1) Olague portrayed

himself as an innocent pawn under Fierro's control, when in fact he was a violent and depraved criminal in his own right; and (2) Olague tried to convince the jury that witnessing a murder up-close negatively affected his mental health, when in fact Olague had been dealing with mental-health issues for most of his life. Without cataloguing these alleged falsehoods as we have others, suffice it to say that nothing Fierro presents in this part demonstrates that Olague testified falsely. Olague never pretended that he was a model citizen, and the State never presented him as such. In fact, Olague admitted to the jury that he had, prior to the murder, broken into upwards of forty cars. Furthermore, Olague never testified that his heretofore-pristine mental health was ruined as a result of witnessing a murder. He testified that what he saw caused him a great deal of mental distress, anxiety, and fear. Fierro presents nothing to show that this is false. At most, he shows that Olague was violent and mentally unstable both before and after the shooting. But even if that is true, it does not mean that Olague was unaffected by what he saw in February of 1979.

### 3. Cumulative Impact.

With respect to almost all of the alleged falsehoods that Fierro identifies in his -06 application, we conclude that Fierro has failed to make a *prima facie* showing that the jury was left with a false or misleading impression. With respect to the few allegations in which Fierro arguably has made a *prima facie* showing of falsity, we reiterate that we have analyzed their potential for materiality in the aggregate.[29] Even when their collective potential impact

---

[29] *See supra* note 28.

is considered, there is no reasonable likelihood that, but for these various alleged misrepresentations, Fierro's capital murder trial would have ended differently. Fierro has therefore failed to allege facts that, if true, would afford him relief under *Chabot*. We dismiss Claim One as subsequent.

## III. CLAIM TWO: NO VEHICLE TO CONSIDER MITIGATING EVIDENCE

Fierro filed his -03 writ application in May 1990. In it, Fierro complained that his sentencing jury was "precluded from considering and giving effect to mitigating evidence presented in his trial." He expressly cited the Supreme Court's 1989 decision in *Penry v. Lynaugh*.[30] *Penry* held that a capital defendant has an Eighth-Amendment right to a jury instruction enabling the jury to express its "reasoned moral response" to certain classes of mitigating evidence.[31] Thus, "the absence of instructions informing the jury that it c[an] consider and give effect to [those kinds of] mitigating evidence" is objectionable under the Eighth Amendment and can form the basis for vacating a death sentence.[32]

According to Fierro's -03 writ application,

> The jury heard testimony that [Fierro] came from a broken home, used drugs and alcohol, was raised in poverty, helped his parents as a primary caretaker for his [intellectually disabled] younger brother Raul, supported his own children and was a good father to them, and manifested his religious devotion and artistic ability through religious paintings.

---

[30] *Penry v. Lynaugh*, 492 U.S. 302 (1989).

[31] *Id.* at 328.

[32] *Id.*

But Fierro's jury was only given two special issues to decide in punishment. The first was, "Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?" The second was, "Do you find from the evidence beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" Fierro argued in the -03 writ and argues in his -06 writ that neither of these instructions provided an adequate vehicle for the jury to consider and give effect to the mitigating evidence that he presented at trial. We denied this claim in 1990.

Subsequent legal developments have shown that that disposition is no longer supportable.[33] In the first place, it cannot be reasonably maintained that the rule announced in *Penry* was purely prospective. *Penry* itself explained that its holding was "dictated by" earlier Supreme Court decisions in capital cases, and so was not a "new rule" in contemplation of the Supreme Court's retroactivity jurisprudence.[34] The requirement that capital juries be given some vehicle to "consider and give effect to" mitigating evidence therefore existed even before *Penry* was handed down.

---

[33] *See Ex parte Moreno*, 245 S.W.3d 419, 429 (Tex. Crim. App. 2008) (explaining that when our disposition of an earlier writ "was not only incorrect, but indeed, so plainly incorrect that today it would undoubtedly be considered objectively unreasonable by the Supreme Court," nothing prohibits us from reconsidering that earlier disposition and, if warranted, granting relief) (internal quotation marks omitted).

[34] *See Penry*, 492 U.S. at 318–19 (citing *Teague v. Lane*, 489 U.S. 288, 301 (1989)).

Perhaps this raises the concern that, because Fierro did not request a *Penry*-type instruction in the trial court, he forfeited his Eighth-Amendment right to receive one. But in 1991, we held that capital defendants tried pre-*Penry* did not forfeit their *Penry* claims by failing to object to the lack of a mitigation instruction at trial.[35] We have reaffirmed this holding in at least one published opinion since then.[36] In light of these and other opinions, it cannot reasonably be maintained that Fierro's *Penry* claim was forfeited for want of a suitable objection in the trial court.

Finally, it is beyond any reasonable dispute that, on the merits, a *Penry* violation occurred in Fierro's capital sentencing proceeding. Fierro presented evidence that both we and the Supreme Court have come to regard as the kind of "two-edged" mitigating evidence calling for a separate, mitigation-focused jury instruction. He did not receive any such instruction. And, whatever harm analysis rightly applies in this situation,[37] we conclude that the absence of a *Penry*-compliant jury instruction in Fierro's trial was harmful. Fierro's

---

[35] *Selvage v. Collins*, 816 S.W.2d 390, 392 (Tex. Crim. App. 1991).

[36] *See, e.g.*, *Ex parte Hathorn*, 296 S.W.3d 570, 572 (Tex. Crim. App. 2009) (citations omitted).

[37] *Compare Hathorn*, 296 S.W.3d at 572 ("We acknowledge that normally, an egregious harm standard is proper in analyzing an un-objected-to charge error. However, rather than characterize this as a jury charge error, we interpret the Supreme Court cases related to this particular issue to have broader due process implications."), *with Olivas v. State*, 202 S.W.3d 137, 145 (Tex. Crim. App. 2006) ("The appropriate standard for all errors in the jury charge, statutory or constitutional, is that set out in *Almanza*.") (some punctuation omitted) (referring to *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

death sentence can no longer stand.

## IV. CONCLUSION

We will reconsider a previously decided habeas application only under the most extraordinary of circumstances.[38] It is an "unusual" measure that we ought not and do not take lightly.[39] But in this case, we are justified in doing so. In his -03 application, Fierro raised what can only be described as a meritorious *Penry* claim. We denied relief, concluding that that outcome was dictated by the law at that time. Assuming that is so, subsequent legal developments have shown that adhering to our initial disposition would be objectively unreasonable.

On our own initiative, we re-open Fierro's -03 writ application and grant him relief on the *Penry* claim therein. We therefore dismiss Claim Two of Fierro's -06 writ (the present-day *Penry* claim) as moot. We dismiss Claim One of Fierro's -06 writ as subsequent for failing to make a *prima facie* showing of a due process violation. Fierro's death sentence is vacated, and he is remanded to El Paso County for a new punishment proceeding.

Delivered: December 18, 2019

Do Not Publish

---

[38] *Moreno*, 245 S.W.3d at 427.

[39] *Id*. at 420, 428.