IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






 NOS. WR-50,961-04 & -05






EX PARTE RODNEY REED, Applicant







ON APPLICATIONS FOR A WRIT OF HABEAS CORPUS

IN CAUSE NUMBER 8701 IN THE 21ST DISTRICT COURT 

OF BASTROP COUNTY




 Per curiam.


O R D E R 



 Rodney Reed was convicted of capital murder and sentenced to death for the murder
of Stacey Lee Stites. We affirmed his conviction and sentence on direct appeal. (1) Reed filed
his initial application for a writ of habeas corpus in November 1999, and we denied relief in
a written order in February 2002. (2) In February 2001, while his initial application was
pending, Reed filed a "Supplemental Claim for Relief on Application for a Writ of Habeas
Corpus." We construed that filing as a successive application and dismissed it because
Reed's claim did not meet the dictates of Texas Code of Criminal Procedure, Article 11.071,
Section 5. (3) Reed then sought federal habeas corpus relief, filing a petition for a writ of
habeas corpus under Title 28, United States Code, Section 2254. Finding that Reed failed
to exhaust all of his claims in this Court, the district court entered a stay in March 2004. (4) 
Reed filed a second subsequent state application for a writ of habeas corpus in March 2005. 
We dismissed some of the claims raised in that application under Article 11.071, Section 5
and remanded two of Reed's claims raised under Brady v. Maryland (5) to the district court so
that it could hold a live evidentiary hearing. (6) After the case was returned to us, we filed and
set it for submission. After an exhaustive review of Reed's Brady claims and gateway-actual-innocence claims under Article 11.071, Section 5(a)(2), we denied relief last month
in a published opinion in light of the evidence properly before us. (7) 

 Taking a piecemeal approach, Reed filed two more subsequent applications while his
second subsequent application was pending. (8) In the first of these later applications, Reed
contends that the State suppressed evidence that Jimmy Fennell abused his ex-girlfriend,
Pamela Duncan. In support of this claim, Reed attached an affidavit from Duncan, sworn
to on April 6, 2006, which we considered a part of Reed's gateway-actual-innocence claim
on his second subsequent application. As observed in our recent opinion: "Duncan describes
Fennell as abusive, possessive, controlling, and extremely prejudiced toward African-Americans. When Duncan broke up with Fennell, he stalked her until he left Giddings; she
was afraid for her safety and that of her children." In her affidavit Duncan states, in part: 

 My friends were not comfortable with Jimmy and they stopped hanging around
us, all except for one. He was not very friendly, and made my friends feel
unwelcome. My friends also didn't think that he treated me very well. He was
very verbally hostile to me, called me some really unpleasant, mean names
(describing me, my parents, and the fact that I had kids at a younger age), and
would scream at me in public. 

 

 Jimmy was extremely prejudiced. Before we started dating, I used to get my
hair cut by a black woman. After we started dating, he wouldn't let me go to
her anymore, because her salon 'was across the tracks' and 'white women
don't go there.' At one point I was considering hiring a black woman to work
at the store and Jimmy got really angry. He told me everything he thought
about black people (he didn't say 'black people;' he used the N-word) -- that
they were all bad, all on drugs, all crocks -- and why I shouldn't hire her. I
ended up hiring her and that was a big problem between us for a couple
months.

 

 I broke up with Jimmy in September of 1997. Jimmy stalked me for months
after that -- until he left Giddings altogether. He would drive by my house,
night after night, and shine a spotlight into the house. It got so bad that I
finally put tin foil up in my windows, to reflect the light. He would stand
outside my house at night, screaming at me, calling me a 'bitch' and other
obscenities. He would come by my job at the Circle K, and just sit parked out
front, with the headlights shining into the store. He would stay there, sitting
in his car and watching me, for anywhere from two minutes to two hours . . .
Once he came into the store and wouldn't let me out of the office--we had to
call the police to get someone to escort him out, so I could leave. He would
hassle any guy I tried to date until it scared them away. For instance, I dated
one guy who delivered beer in town. After we started dating, Jimmy sta[r]ted
pulling him over and giving him tickets. He got so many tickets he couldn't
keep his job anymore. 

 

 What Jimmy did after I broke up with him really scared me. It made me feel
like I knew what he was capable of, and that made me afraid for me and my
kids. It made my parents afraid for my safety. The fact that he was a police
officer made it much more difficult. I felt like I was being constantly harassed
and threatened, and there was nowhere to go. I finally filed a report with the
police, and another officer came and told me that they would make sure he left
me alone. A friend of mine later went down to the police station looking for
the report I filed, and they couldn't find it. Things got better after I filed the
report, and the officer came and talked to me, but the harassment didn't stop
altogether until Jimmy moved away from Giddings. 


 Reed asserts that Duncan's account of her relationship with Fennell is exculpatory for
two reasons. First, it supports his theory that Fennell murdered Stacey because it confirms
other evidence of Fennell's violent and abusive character and gives an additional explanation 
of Fennell's motive to kill Stacey--Reed's affair with Stacey coupled with racial
discrimination. Second, Reed asserts that Duncan's account would have been valuable
impeachment evidence at trial because Fennell testified that he did not have a controlling
relationship with Stacey. 

 Reed maintains that Duncan's account was suppressed by the State because Duncan
reported Fennell's abusive conduct to the Giddings Police Department. Reed states that,
while the Giddings Police Department was not the primary agency involved in investigating
Stacey's murder, it participated in the investigation and should therefore be regarded as part
of the prosecution team. Reed further argues that his claim meets the standards of Section
5 because the factual basis was previously unavailable. We disagree. Assuming that the
information qualifies as Brady material, (9) Reed has failed to show that, through exercise of
due diligence, the information contained in Duncan's affidavit was not available during
Reed's trial in 1998 and when he filed his initial application. (10) Therefore, we dismiss Reed's
third subsequent application as an abuse of the writ. 

 In his fourth subsequent application, Reed claims that he is entitled to relief based on
newly discovered evidence of actual innocence. (11) He also contends that he is entitled to have
the merits of his Brady and ineffective assistance of counsel claims reviewed because he has
made a threshold showing of actual innocence under Article 11.071, Section 5(a)(2). Finally,
Reed asserts that he is entitled to relief under Brady.

 Reed first presents evidence that Fennell has, in recent years, performed sexual acts
of misconduct as a police officer. In December 2007, the State charged Fennell in
Williamson County, Texas with aggravated sexual assault with a deadly weapon, aggravated
kidnaping, improper sexual activity with a person in custody, and official oppression. An
officer with the Williamson County Sheriff's Department set out the factual allegations
underlying the charges in an affidavit for a search warrant signed by that is attached to
Reed's application:

 On October 26, 2007, Affiant was asked to assist in an investigation of
an allegation that Jimmy Lewis Fennell, Jr., sexually assaulted an adult female. 
The female victim has elected to use . . . the pseudonym name of 'Amanda
Smith.' Jimmy Lewis Fennell, Jr. is a peace officer employed as a patrol
sergeant with the Georgetown Police Department. Ms. Smith reported at
approximately 1:50 a.m. on October 26, 2007 to the Williamson County
Sheriff's Department that she had been sexually assaulted by a police officer,
who has now been identified as Jimmy Lewis Fennell, Jr., at a location in
Williamson County which she believed to be a park. 

 Ms. Smith told Affiant that the Georgetown Police Department had sent
officers to a scene at an apartment complex in Georgetown where she was
fighting with her boyfriend, and that while the officers were there an officer
had her in his patrol car. Ms. Smith's boyfriend was arrested and taken from
the location, and an 'Officer Fennell' had taken her from the apartment in his
patrol car. Prior to being taken from the scene, Ms. Smith had been vomiting
due to intoxication. Ms. Smith was handcuffed and allowed to ride in the front
seat of the patrol car. Ms. Smith believed that the officer was going to take her
to a hotel so that she would have a place to stay, since the people she had been
staying with were friends of her boyfriend and would not answer the door at
the apartment complex. 'Officer Fennell' drove her to a location which she
believed to be a park, stopped the patrol unit, and got her out of the car. 
Fennell unhandcuffed her and asked her to dance for him outside of his patrol
unit, pulled down her pants, and penetrated her vaginally from behind with his
penis. The defendant asked her if she liked it[;] she said no and asked him to
stop, and he did not. When the officer was finished, he drove her back to the
original apartment complex and dropped her off. The victim immediately
reported the sexual assault by calling 911. 


 The affidavit also states that the victim positively identified Fennell in a photo spread
as the assailant. The affidavit further noted that the Georgetown Police Department was
cooperating in the investigation by providing Fennell's patrol car and the relevant dispatch
logs to the Sheriff's Department. A review of the dispatch logs showed that Fennell could
not be accounted for just after midnight to 1:52 a.m. The victim's prints were found on the
trunk of the patrol car, "which is consistent with the location where the victim reported the
sexual assault occurred in relation to the vehicle."

 John Bradley, the District Attorney for Williamson County, entered into a plea-bargain
agreement with Fennell. Waiving some of the charges, the District Attorney and Fennell
entered into an agreement relating to only the charges of improper sexual activity with a
person in custody and kidnapping. On the former, Fennell agreed to plead guilty in exchange
for a two-year state jail sentence. And on the latter, Fennell agreed to plead guilty in
exchange for a ten-year probated sentence, to be served concurrently with the two-year state
jail term, and a $500 fine. Fennell also agreed to permanently surrender his peace officer's
license. On May 20, 2008, Fennell appeared before District Judge Burt Carnes and pled
guilty to the charges. Judge Carnes reset the case for June 24th for sentencing. The record
before us goes no further; therefore, we have no official documentation concerning the final
resolution of this case.

 Next, Reed submits an incident report for the Travis County Sheriff's Department. 
The report documents an incident that occurred in May 2004 between Fennell and a woman
named Angie Lee Smith. Fennell stopped Smith on Interstate 35 for a "crooked license
plate." Smith's driver's license and vehicle registration were expired, and she told Fennell
that she would take care of it on Monday. Fennell suggested that she take care of it by giving
him a lap dance. Smith "diverted the conversation by talking about the Williamson County
Sheriff and saying that she knew him and his wife at which point she was released." 

 Finally, Reed contends that Fennell maintained an internet page on MySpace.com that
contained sexually explicit and violent images. In support of this, Reed attaches several
printouts from the MySpace page belonging to an individual named "pointman_1." The
other details from the page indicate that "pointman_ 1" is an individual claiming to be a
thirty-four-year-old, 5'11", straight white male, "Swat Operator" in Texas. 

 Reed contends that all of this information is newly-discovered evidence of actual
innocence. We disagree. First, regarding the MySpace page excerpts, other than mere
conjecture by Reed, there is no concrete proof in the record to support Reed's claim that they
have any relation to Fennell. And with respect to charges in Williamson County and the
Travis County Incident Report, other than showing that Fennell has engaged in despicable
and reprehensible conduct as an officer with the Georgetown Police Department, the
information does not exonerate Reed of Stacey's murder. (12) 

 Reed also claims that this evidence, viewed on its own, and viewed in conjunction
with some of the other evidence considered under his prior gateway-innocence claims, as
well as new evidence presented on this, his fourth subsequent application, meets the gateway
standard of innocence under Article 11.071, Section 5(a)(2). Viewing only the evidence
presented on this application alongside the evidence presented at trial, we cannot say that
Reed has established that it is more likely than not that no reasonable juror would have
convicted him beyond a reasonable doubt. (13) And, giving Reed the benefit of all doubt, as we
did before, by considering all of the evidence not presented at his trial (i.e., the "new"
evidence presented on his prior applications), (14) we cannot say that Reed has shown by a
preponderance of the evidence that no reasonable juror would have convicted him beyond
a reasonable doubt. The totality of the evidence before us still supports a guilty verdict. 
Finally, we turn to the two items of evidence, presented for the first time on this application,
that Reed relies on as additional support for his gateway-innocence claim. 

 First, Reed attaches a letter written by Fennell to the Giddings City Manager several
months after Reed's trial. The letter details Fennell's dissatisfaction with the management
of the Giddings Police Department, and in doing so, alludes to statements allegedly made by
Officer David Hall: "David Hall made several comments during the murder investigation of
my fiancee. I have learned to forgive and forget. But I understand Hall as does [sic] the
other patrolman [sic]." Fennell continued, stating that "Hall is mad because he wants
stripes. Hall will burn anyone to get this position. We are all aware of this problem and deal
with it." Reed claims that the first portion of Fennell's comments about Hall cannot be
discounted as "idle gossip in light of the State's DNA testing that links Mr. Hall to a mixture
of saliva found on a beer can near [Stacey's] body." According to Reed, the statements "begs
the questions: what did Mr. Hall say?, [sic] when did he say it?, [sic] and to whom?" Reed
also contends that Fennell's statements imply that Officer Hall was not Fennell's friend and
therefore contradicts the testimony of Officer Hall and his wife, Carla Hall, that the two were
close friends. 

 Next, Reed points to former Bastrop County Sheriff Richard Hernandez's guilty plea
in January 2008 to six felony counts, including theft by a public servant, misapplication of
fiduciary property, and abuse of official capacity. According to Reed, the theft began in
1997, when the Sheriff's Department was investigating Stacey's murder, and continued
through Reed's trial. Reed maintains that "[t]his could only have established a culture of
lawlessness at the agency and casts a dark shadow on the reliability of the investigation of
the murder of [Stacey]." 

 Viewing this evidence in conjunction with all of the gateway-actual-innocence
evidence that we have previously considered and with the evidence presented at trial, we
cannot say that Reed has established that no reasonable juror would have rendered a guilty
verdict beyond a reasonable doubt. The totality of the evidence before us still supports a
guilty verdict. Therefore, we conclude that Reed has failed to meet the gateway standard of
innocence under Article 11.071, Section 5(a)(2).

 Reed also contends that Officer Hall's statements and the former Bastrop County
Sheriff's crimes of moral turpitude constitute evidence of actual innocence under Ex parte
Elizondo and were suppressed in violation of Brady. This evidence does nothing to
exonerate Reed of Stacey's murder; therefore, Reed has failed to make a prima facie showing
of actual innocence under the Ex parte Elizondo standard. (15) Next, with regard to Reed's
Brady claims, assuming that Brady is even applicable, (16) we conclude that his claims are
conclusory and premised on nothing more than mere conjecture and speculation. Thus, Reed
has not pled specific, particularized facts, that if true, would entitle him to relief. (17)

 Based on the foregoing, we dismiss Reed's fourth subsequent application as an abuse
of the writ.


DATE DELIVERED: January 14, 2009

DO NOT PUBLISH
1. Reed v. State, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000) (not designated for
publication).
2. Ex parte Reed, No. WR-50,961-01 (Tex. Crim. App. Feb. 13, 2002) (not
designated for publication). 
3. Ex parte Reed, No. WR-50,961-02 (Tex. Crim. App. Feb. 13, 2002) (not
designated for publication). 
4. Reed v. Dretke, No. A-02-CA-142-LY (W.D. Tex., Mar. 22, 2004).
5. 373 U.S. 83 (1963). 
6. Ex parte Reed, No. WR-50,961-03 (Tex. Crim. App. Oct. 2005) (not designated
for publication). 
7. Ex parte Reed, AP-75,693, 2008 Tex. Crim. App. LEXIS 1569 (Tex. Crim. App.
Dec. 17, 2008). 
8. Ex parte Reed, Nos. WR-50,961-04 & -05. 
9. But see United States v. Pelullo, 399 F.3d 197, 217 (3d Cir. 2005) ("the
prosecution was under no obligation to 'ferret out evidence from another pending
proceeding with a tenuous connection to the prosecution.'"); United States v. Beers, 189
F.3d 1297, 1304 (10th Cir. 1999) ("It is unrealistic to expect federal prosecutors to know
all information possessed by state officials affecting a federal case, especially when the
information results from an unrelated state investigation."). 
10. See Tex. Code Crim. Proc. art. 11.071 § 5(e).
11. See Ex parte Elizondo, 947 S.W.2d 202 (Tex. Crim. App. 1997).
12. Id. at 209. 
13. Ex parte Reed, 2008 Tex. Crim. App. LEXIS 1569, at *95 (citing Ex parte
Brooks, 219 S.W.3d 396, 399 (Tex. Crim. App. 2007)). 
14. Id. at *96 (noting that we were considering all of the evidence presented on
Reed's three prior applications but had serious doubt "that some of the evidence Reed
cites constitutes new evidence for purposes of our [gateway] inquiry").
15. See Ex parte Brooks, 219 S.W.3d 396, 400 (Tex. Crim. App. 2007); Ex parte
Briseno, 135 S.W.3d 1, 3 (Tex. Crim. App. 2004). 
16. See generally Petition for Writ of Certiorari, District Attorney's Office for the
Third Judicial District, et al. v. Osborne, 129 S. Ct. 488 (No. 08-6), granted Nov. 3, 2008.
17. See Ex parte Staley, 160 S.W.3d 56, 64 (Tex. Crim. App. 2005).