United States Court of Appeals
Fifth Circuit

**F I L E D**

April 2, 2004

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 00-41272

———————————————

CHARLES DEAN HOOD,

Petitioner-Appellant,

versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

--------------------
Appeal from the United States District Court
for the Eastern District of Texas
(99-CV-109 )
--------------------

Before SMITH, WIENER, and STEWART, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant Charles Dean Hood appeals the district court's denial of 28 U.S.C. § 2254 relief. We affirm.

## I. FACTS AND PROCEEDINGS

Hood's petition for writ of habeas corpus stems from his 1990 conviction and death sentence for the murders of Ronald Williamson and Tracie Lynn Wallace. During the fall of 1989, Hood, who was employed by Williamson, began living with Williamson and Wallace,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Williamson's girlfriend. On November 1, 1989, Williamson came home from work for lunch and found a note purportedly written by Wallace stating that she had gone jogging. Williamson grew suspicious when he noticed that Wallace's name had been misspelled and called the police to report her possible abduction. When the police arrived at Williamson's home, they discovered the bodies of Williamson and Wallace with gunshot wounds to their heads.

Prior to his trial, Hood moved for the appointment of an independent psychiatrist to assist him in preparing a mitigation defense at sentencing. The trial judge granted his motion in part and issued an order specifying that Hood was to elect in writing either of two alternatives: (1) Have Dr. Sidney Brooks conduct the psychiatric examination and report his findings to both parties, or (2) Hood and the State each designate a psychiatrist who together would conduct a joint interview of Hood and report only to the designating parties.

Although no written election was ever made, Dr. Brooks examined Hood and concluded that he had a brain dysfunction and an antisocial personality, and that in the future he was likely to act out his aggressions on other persons or property. Dr. Brooks did not testify at trial, but the State presented psychiatric evidence that, in the future, Hood would probably commit criminal acts of

2

violence and was therefore a continuing threat to society, a finding necessary for the jury to impose the death penalty.[1]

Hood's conviction and sentence were affirmed by the Texas Court of Criminal Appeals.[2] The Supreme Court of the United States denied certiorari.[3] In April 1997, Hood's state habeas application was denied by the Texas Court of Criminal Appeals,[4] and in February 2000, Hood sought federal habeas relief.

Although it ultimately denied habeas relief, the district court found that Hood's counsel had misread the trial court's order regarding the appointment of a psychiatrist, which in turn had resulted in a violation, albeit harmless, of his right to a psychiatrist under Ake v. Oklahoma.[5] The district court concluded that counsel had performed deficiently by assigning to a paralegal the duty of collecting mitigating evidence to be used at Hood's sentencing. It therefore granted Hood a certificate of appealability (COA) on (1) whether Hood's counsel's misreading of the trial court's order regarding Hood's psychiatric examination and counsel's delegating to an untrained legal assistant the

---

[1] See TEX. CRIM. PROC. CODE ANN. § 37.071(b)(2) (Vernon 1981 & Supp. 2003).

[2] Hood v. State, No. 72,167 (Tex. Crim. App. Nov. 24, 1993) (unpublished).

[3] Hood v. Texas, 513 U.S. 834 (1994).

[4] Ex parte Hood, No. 41,168-01 (Tex. Crim. App. Apr. 21, 1999) (unpublished).

[5] 470 U.S. 68 (1985).

investigation into potential mitigating evidence created a reasonable probability that the result of his punishment hearing would have been different if counsel's performance had been adequate, and (2) whether the cumulative effect of the violations of Hood's rights under Ake and his counsel's deficient performance deprived him of a fair trial.

## II. ANALYSIS

A. Strickland Prejudice

1. Standard of Review

At issue is Hood's sentence, not his conviction. Under the AEDPA,[6] a federal habeas petition may not be granted with respect to a claim adjudicated on the merits in state court unless that court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[7] "A decision is contrary to clearly established Federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a

---

[6] Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996).

[7] 28 U.S.C. § 2254(d)(1) & (2).

4

set of materially indistinguishable facts.'"[8] "Under § 2254(d)(1)'s 'unreasonable application' language, a writ may issue 'if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"[9]

In this case, the "clearly established Federal law" is the Supreme Court's decision in Strickland v. Washington,[10] governing claims based on ineffective assistance of counsel. For Hood to prevail on such a claim, he must show that (1) his counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) such deficient performance prejudiced Hood's defense.[11] Given the limited scope of the COA grant, however, we need examine only whether Hood has met Strickland's prejudice prong, under which he "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"[12]

---

[8] Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).

[9] Id. (quoting Williams, 529 U.S. at 413).

[10] 466 U.S. 668 (1984).

[11] Id. at 687-94.

[12] Bryant v. Scott, 28 F.3d 1411, 1415 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 694).

5

For the sentencing phase of a capital case, counsel must conduct a "reasonably substantial, independent investigation into potential mitigating circumstances."[13]  In determining whether Hood was prejudiced by a deficient presentation of mitigating evidence, we must compare the evidence presented at sentencing with the mitigating evidence adduced in the post-conviction record to ascertain if "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Hood's] reduced moral culpability, death was not an appropriate sentence[.]"[14]

2.  Deficiency of Performance

Hood contends that if the new mitigating evidence presented during his state habeas proceeding had been presented during the penalty-phase proceeding of his trial, there is a reasonable probability that at least one juror would have voted to spare his life.  During the penalty phase, the defense's primary mitigation witness was Hood's mother, whose testimony painted the following picture:  (1) From the time of his birth, Hood's family moved frequently; (2) he was hit by a septic truck at age three, injuring his lower back and leg and possibly causing speech and behavior

---

[13] Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (internal quotations and citation omitted), cert. denied, 537 U.S. 1104 (2003).

[14] Id. at 241 (footnote omitted).

problems; and (3) he was a chronic truant throughout his short school career in which he achieved only a seventh grade education.

The new mitigating evidence presented during the state habeas proceeding consisted primarily of affidavits, social services records, school records, and a social history report. That evidence augments the evidence of mitigating circumstances presented during the penalty phase of Hood's trial by (1) presenting additional details about his injuries caused by the septic truck; (2) providing more details regarding his behavioral problems in school and his learning disability; and (3) adding new claims that (a) Hood and his siblings suffered physical and emotional abuse at the hands of their domineering father, (b) his father sexually molested Hood's two sisters, and (c) Hood may have suffered some type of brain damage at birth.

Our determination whether the state court unreasonably applied Strickland is guided by the Supreme Court's decisions in Williams and, most recently, Wiggins v. Smith.[15]  In each case, the Court held that the petitioner had established Strickland prejudice from counsel's constitutionally deficient presentation of mitigating evidence.[16]  In Hood's case, however, the mitigating evidence is far weaker and the evidence in support of the death penalty considerably stronger than in Williams and Wiggins.  As we shall

---

[15] --- U.S. ----, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

[16] See Wiggins, 123 S. Ct. at 2543; Williams, 529 U.S. at 398.

explain, this ultimately prevents his establishing the requisite prejudice.

We have construed <u>Williams</u> to require that an evaluation of <u>Strickland</u> prejudice include consideration of both the quantity and quality of the additional mitigating evidence.[17] Hood presented a total of 217 pages of mitigating evidence, yet 107 pages of that evidence, approximately one-half, consists solely of social service and counseling records pertaining to the sexual abuse suffered by Hood's sisters. Even though these social service documents verify the tragic circumstances surrounding the relationship of Hood's sisters with their father, as well as their mother's inadequate response to the abuse, they do not specifically relate to Hood.

The quality of the remaining evidence is wanting. For example, State witness Dr. Richard Coons, a psychiatrist, testified on cross-examination during the penalty phase that children like Hood, who had been "nearly crushed to death by a truck," may develop brain or personality problems if there was damage to the brain. Hood's hospital records which document the injuries he received from the septic truck make clear, however, that he suffered no head injury. Additionally, despite testimony that Hood suffered speech problems after his accident, trial witnesses Cynthia Insashi and Peggy Kliener testified that they had not noticed anything unusual about Hood's speech. Furthermore, no

---

[17] <u>See</u> <u>Neal</u>, 286 F.3d at 243.

medical records were adduced to support or expand on Mrs. Hood's affidavit testimony that her son was born with an enlarged head and black face, suggesting possible brain damage.

Evidence that Hood's sisters were sexually abused by their father is not of the same quality as evidence previously held to have the capability of reducing a capital defendant's moral culpability in the eyes of the jury.[18] Significantly, there is no testimony that Hood knew of his sisters' abuse or how he was affected by it.

Furthermore, while there is new evidence that Hood was physically abused by his domineering father, Hood had categorically denied during his evaluation with Dr. Brooks that he had ever been physically abused by either parent. The State certainly would have introduced this fact to the jury to rebut any allegation of abuse, and such conflicting evidence would have created a credibility issue for the jury which might not have been resolved in Hood's favor.

Although the mitigating evidence revealed that Hood's I.Q. was low-average, it was nevertheless markedly higher than those of Williams and Neal.[19] Evidence that Hood is predisposed to impulsive

---

[18] Cf. Wiggins, 123 S. Ct. at 2533 (Wiggins gang-raped in foster care and sexually abused by his Job Corps supervisor); Neal, 286 F.3d at 238 (Neal forced to sodomize 30 to 40 inmates in succession and raped by two others).

[19] See Williams, 529 U.S. at 396 ("'[B]orderline mentally retarded'"); Neal, 286 F.3d at 237 (I.Q. of 54, "low end of mild retardation").

behavior is likewise undercut by the fact that the murders of Williamson and Wallace were premeditated.[20]

Even though Dr. Marc Walter's post-trial neuropsychological examination "suggest[ed]" that Hood had brain damage or dysfunction, with an impairment in the left temporal lobe of his brain, Dr. Walter's report did not, for purposes of reducing his moral culpability, connect this purported brain damage with Hood's ability or inability to control his behavior. Rather, Dr. Walter was of the opinion that Hood's brain dysfunction rendered him incapable of proceeding pro se in his state habeas proceedings.

Also, mitigating evidence of Hood's brain dysfunction is cumulative of testimony on that same subject that was heard by the jury at Hood's penalty-phase proceeding. During defense counsel's cross examination of State psychiatrist Dr. Richard Coons, the jury learned that Dr. Brooks had diagnosed Hood with "neurophysiological brain dysfunction with probable left temporal cortical and deep temporal limbic brain dysfunction." Dr. Coons testified that Dr. Brooks's diagnosis referred to a biological dysfunction within the brain and that there are scientists who theorize that a congenital problem with the brain may cause specified individuals to be conscienceless, causing the antisocial personality disorder with which Hood was diagnosed. The jury thus learned that Hood had been

_____

[20] Cf. Williams, 529 U.S. at 398 ("[I]n each case [Williams's] violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation.").

10

diagnosed by one physician with a brain disorder and, furthermore, that such a disorder might possibly be the cause of his behavior.

We weigh the totality of the mitigating evidence adduced at trial and in the state habeas proceeding against the aggravating evidence.[21] During both the guilt-innocence and penalty phases, the jury heard the following aggravating evidence concerning the offense, Hood's lack of remorse, his history of violence, his criminal history, and his future dangerousness.

The jury learned that Hood shot each victim once in the head, placed plastic bags over Tracie Wallace's head and upper torso, affixed the bags to her body with duct tape, and stuffed her nude body into a water heater closet.  Hood showed no remorse for the murders.[22]  That same morning, Hood calmly ordered flowers for Jill Workman, his girlfriend in Indiana, representing to the florist that he was Ronald Williamson, using Williamson's credit card, wearing Williamson's gold watch and showing it off to the employees.  At a pawn shop on that same day, Hood traded one of Williamson's diamond rings for a wedding band set, presumably for Jill Workman.  He also attempted to cash two company checks that he had stolen from Williamson's computer business, forging Williamson's signature on the checks.

---

[21] Id. at 397.

[22] Cf. id. at 367, 398 (Williams alerted police to his responsibility for the homicide, showed remorse, and assisted their investigation).

While Hood was driving from Texas to Indiana in Williamson's Cadillac, he called Workman on Williamson's cell phone, telling her he was driving a new car that he had just purchased and that he was going to give her a gold watch. Workman testified that during this conversation Hood sounded "excited" and "happy." The day after the murders, Hood called Williamson's son, told him he had been arrested for his father's murder, and denied any involvement in the crime.

The jury also learned that Hood had a history of violent conduct.[23] He had assaulted his father during an altercation with his (Hood's) girlfriend, Trava Henry, and her mother. Hood told the responding officer that he would beat up or kill anyone who tried to touch him. Hood also assaulted Henry when she attempted to end their relationship, and he displayed sexual aggression towards her.

Amy Hartman testified that Hood had raped her when she was 16 years old and told her that if he ever saw her again or if she reported the rape, he would kill her. Hood was fired from a job at a fast food restaurant after only three days on the job when he engaged in a verbal altercation with another employee, and he

---

[23] Cf. Wiggins, 123 S. Ct. at 2543-44 (Wiggins had no record of violent conduct and no prior convictions).

even fought with a fellow inmate while incarcerated awaiting trial on the instant offense.[24]

The jury learned additionally that Hood had a prior criminal record. He had juvenile adjudications for breaking and entering and had been convicted as an adult of the felony offenses of forgery and theft. While on parole, he was not prompt for his parole appointments, and he failed to complete his parole because he absconded to Texas. Finally, the jury heard testimony that Hood had been diagnosed with antisocial personality disorder, was a sociopath with little chance of rehabilitation, and would more likely than not pose a future danger to the public.

We conclude that, when viewed in the light of the quality of the mitigating evidence as compared with the strength of the aggravating evidence, Hood has failed to show that the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Hood's] reduced moral culpability, death was not an appropriate sentence[.]"[25] The state court's prejudice determination was therefore a reasonable application of Strickland, and Hood is not entitled to habeas relief on this claim.

B. Cumulative Error

---

[24] Cf. Williams, 529 U.S. at 395-96 (Williams received commendations for good behavior in prison and thrived in its structured environment).

[25] See Neal, 286 F.3d at 241 (footnote omitted).

13

In support of his cumulative error argument, Hood relies solely on his contention that if the defense had presented the new mitigating evidence adduced during his state habeas proceeding, at least one juror might have determined that a life sentence was appropriate. "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"[26] To determine whether application of the cumulative error doctrine warrants relief, we "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict."[27] Claims that are not prejudicial, however, cannot be cumulated, regardless of the number raised.[28] Hood's failure to satisfy <u>Strickland</u>'s prejudice prong precludes his showing constitutional error with regard to his ineffective assistance claims.[29] Inasmuch as counsel's alleged deficiencies resulted in no prejudice, Hood's claim of ineffective assistance of counsel

---

[26] <u>Derden v. McNeel</u>, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)).

[27] <u>Spence v. Johnson</u>, 80 F.3d 989, 1001 (5th Cir. 1996) (internal quotations and citation omitted).

[28] <u>Westley v. Johnson</u>, 83 F.3d 714, 726 (5th Cir. 1996).

[29] See <u>Strickland</u>, 466 U.S. at 697.

cannot be cumulated with the Ake error claim, so his cumulative error claim necessarily fails.[30]

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[30] See Westley, 83 F.3d at 726.