

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-75,370
---

### EX PARTE CHARLES DEAN HOOD, Applicant

---
### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM CAUSE NO. W296-80233-90 IN THE 296TH DISTRICT COURT
### COLLIN COUNTY
---

COCHRAN, J., announced the judgment of the Court and delivered the opinion of the Court as to Part III, in which PRICE, WOMACK, JOHNSON and HOLCOMB, JJ., joined, and an opinion as to Parts I and II in which PRICE, JOHNSON and HOLCOMB, JJ., joined. MEYERS, J., dissented. KEASLER, J., filed a dissenting opinion in which KELLER, P.J., and HERVEY, J., joined.

## OPINION

We wade once more into the murky waters of *Penry* law and the Texas death-penalty sentencing scheme. The ebb and flow of constitutional jurisprudence concerning when and what special instructions are necessary for the jury to give meaningful consideration to relevant mitigating evidence has sharply divided the United States Supreme Court, the Fifth Circuit, and this Court for some twenty years. The Chief Justice of the Supreme Court has noted that the jurisprudence surrounding the intersection of mitigation evidence and the

Texas "nullification instruction" in pre-1991 death-penalty cases is "a dog's breakfast of divided, conflicting, and ever-changing analyses."[1]  Reasonable jurists differ on these matters.

Therefore, we granted applicant a stay of execution on September 9, 2008, stating that, "[b]ecause of developments in the law regarding nullification instructions, . . . it would be prudent to reconsider the decision we issued [on January 10, 2007] in dismissing applicant's second subsequent writ application."[2]  We must reconsider whether applicant could have raised his *Penry* claim–a claim alleging that the entirety of the sentencing scheme employed by the trial court precluded the jury from giving full consideration and effect to his mitigating evidence–before May 24, 2004, when he filed a *pro se* subsequent writ.

We conclude that five United States Supreme Court decisions, all of which were

---

[1] *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 267 (2007) (Roberts, C.J., dissenting).  The Chief Justice noted:

> We give ourselves far too much credit in claiming that our sharply divided, ebbing and flowing decisions in this area gave rise to "clearly established" federal law.  If the law were indeed clearly established by our decisions "as of the time of the relevant state-court decision," it should not take the Court more than a dozen pages of close analysis of plurality, concurring, and even dissenting opinions to explain what that "clearly established" law was.  When the state courts considered these cases, our precedents did not provide them with "clearly established" law, but instead a dog's breakfast of divided, conflicting, and ever-changing analyses.  That is how the Justices on *this* Court viewed the matter, as they shifted from being in the majority, plurality, concurrence, or dissent from case to case, repeatedly lamenting the failure of their colleagues to follow a consistent path.  Whatever the law may be today, the Court's ruling that 'twas always so–and that state courts were "objectively unreasonable" not to know it–is utterly revisionist.

*Id.* at 266-67 (citations omitted).

[2] *Ex parte Hood*, Nos. WR-41,168-10 & AP-75,370 (Tex. Crim. App. Sept. 9, 2008) (not designated for publication).

issued after applicant filed his *pro se* writ on May 24, 2004,[3] announced "new law" directly applicable to applicant's claim for purposes of Article 37.071, § 5.[4]   Therefore, his second subsequent writ application, filed in 2005, should be reinstated because it was not procedurally barred.[5]   We agree with the habeas judge's 2005 factual findings and legal conclusions and accept his recommendation that applicant is, under current and binding constitutional precedent, entitled to a new trial on punishment.[6]

---

[3] *See Tennard v. Dretke*, 542 U.S. 274 (2004); *Smith v. Texas* ("*Smith I*"), 543 U.S. 37 (2004); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Brewer v. Quarterman*, 550 U.S. 286 (2007); *Smith v. Texas* ("*Smith II*"), 550 U.S. 297 (2007).   The earliest of these five cases, *Tennard*, was decided on June 24, 2004, exactly one month after applicant filed his *pro se* subsequent writ.

[4] Tex. Code Crim. Proc. art. 11.071, § 5(a)(1).   This section reads,
If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.]

[5] In *Ex parte Hood*, 211 S.W.3d 767, 770 (Tex. Crim. App. 2007), this Court held that we were "barred from considering the merits [of his second subsequent writ application filed in 2005] because the legal bases upon which applicant relies were available at the time he filed his second application." *Id.*

[6] The trial judge entered his findings on December 6, 2005, in accordance with our remand order of June 27, 2005, after we had found that "applicant has met the requirements for consideration of a claim the basis of which was not available at the time his initial application was filed."   This remand order was based upon *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Smith v. Texas*, 543 U.S. 37 (2004).

I.

Applicant was convicted of capital murder in 1990 for killing his boss and his boss's girlfriend.[7] The evidence showed that applicant's boss had allowed applicant to live in his home, but that applicant had carefully planned and executed the murders, stolen his boss's credit cards, pawned his ring, and forged his name on stolen business checks to cash them.

During the punishment phase, the State offered significant evidence that applicant would constitute a continuing threat to society. This evidence included burglary of a school when a juvenile, theft and forgery convictions, assault on his 15-year-old girlfriend, rape of another 15-year-old girl, threats to a third young woman while he was in jail on this charge, and assault upon a fellow inmate. The State also offered expert testimony from a clinical psychologist and a forensic psychiatrist that applicant had an anti-social personality disorder with little chance of rehabilitation. The evidence was more than sufficient to support the jury's "yes" answers to the special issues.

When we remanded this writ application to the habeas judge in 2005,[8] he made extensive factual findings concerning the mitigating evidence that had been offered at the 1990 trial.[9] These findings included the following:

---

[7] *Hood v. State*, No. 71,167 (Tex. Crim. App. Nov. 24, 1993) (not designated for publication).

[8] The habeas judge was a senior state district judge sitting by assignment. He was not the original trial judge.

[9] Both the State and applicant filed proposed findings of fact and conclusions of law. The habeas judge crafted his own findings and conclusions based upon the parties' submissions.

• when applicant "was three years old, he sustained severe injuries when he was crushed by a truck that backed over him.  Hood was in a state of shock as he rode to the hospital in an ambulance.  His left leg was broken in two places and his left hip was broken.  He had additional injuries to his lower back requiring three skin grafts.  He sustained internal injuries.  Hood had several surgeries, and bones had to be rebroken.  He wore a cast that covered nearly his entire body from his upper chest to his legs.  He remained in the hospital for five months.  Two years passed before Hood was able to relearn how to walk.  He was left with permanent physical injuries from the accident.  His left leg never grew to the size of his right leg, his hip joint remains cracked, and the skin grafts never healed properly on his back."

• applicant "appeared to undergo changes in his behavior after the accident.  He had a noticeable problem with his speech and pronouncing the sounds of the alphabet.  A doctor concluded he hears the sounds in a different way than they are pronounced.  An expert who personally examined Hood stated that his speech defects also included stuttering.  Behavioral changes after the accident were testified to by his mother, which include throwing things, school problems, fear of school, being made fun of by other children and phobias related to being inside building[s]."

• applicant "has learning disabilities and cognitive impairments which became apparent in his schooling.  He received counseling and attended special education throughout his school career.  He failed the second and seventh grades and dropped out of school in the seventh grade."

• additional evidence indicated that applicant "had learning disabilities and low intellectual functioning.  He failed the Army entrance examination three times.  The Indiana Department of Correction administered achievement and intelligence tests at age 19.  Those tests indicated his reading and math skills fell below sixth grade level, his language and writing skills were at the level of a third grader and [he] has an I.Q. of 89, which placed him below the intellectual functioning of more [than] 75% of the population.  Achievement scores were too low to satisfy literacy requirement for the prison work release program."

• applicant suffered "beatings and other injuries" when he was young, "including a head blow with a metal pipe."  An uncalled expert defense witness wrote a report that applicant "suffers from brain impairment, evidenced by learning disabilities, verbal comprehensive problems, language

impairment, speech defects and behavioral dysfunction, including impaired judgment and poor impulse control." The State's expert testified about this defense report and concluded that, although applicant may be suffering from one or more of the defense expert's findings, "he will be a continuing threat based on the State's hypothetical premise."[10]

Applicant's case was tried after the Supreme Court decided *Penry I*,[11] but before the Texas Legislature had convened to draft a statutory mitigation special issue to accommodate the *Penry I* holding.[12] Thus, the trial court submitted the two statutory special issues, but also included a special nullification instruction discussing the manner in which the jury should account for mitigating evidence when answering those special issues.[13] Applicant's counsel

---

[10] Because the record supports these factual findings, we adopt them. *See Ex parte Reed,* 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

[11] *Penry v. Lynaugh*, 492 U.S. 302 (1989).

[12] *See Ex parte Staley*, 160 S.W.3d 56, 58 (Tex. Crim. App. 2005). In *Staley*, this Court noted,

> The 1989 *Penry I* decision created a dilemma for Texas trial courts in capital-murder cases. As the Fifth Circuit has noted, Texas trial courts "could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend the trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown." Thus, Texas state courts attempted to provide timely trials that complied with *Penry I* by drafting extra-statutory jury instructions or supplemental special issues until the Texas Legislature enacted a statutory mitigation special issue which went into effect on September 1, 1991.

*Id.* (citations omitted).

[13] That instruction read,

> You are instructed that you shall consider in answering the special issues any evidence which in your opinion mitigates against the imposition of the death penalty. A mitigating circumstance may include, but is not limited to any aspect of the defendant's character, record, and the circumstances of the crime, which you believe could make a death penalty inappropriate in this case.
> Further, if you believe from the evidence that the State has proven beyond a reasonable doubt that the answers to the Special Issues are "yes" but you are

did not object to the nullification instruction itself, but his colloquies with the trial judge

sound uncannily like the voice of the Supreme Court in its most recent cases.[14]  He did,

however, request additional instructions on the proper use of mitigating evidence[15] and asked

---

further [persuaded] by the mitigating evidence that the defendant should not be sentenced to death in this case, then you shall answer one or both of the Special Issues "no" in order to give the effect to your belief that the death penalty should not be imposed in this case.

[14] When the trial judge first suggested using the nullification instruction, applicant's counsel said,

As the Court knows, this is a pretty new concept in our capital litigation, and it is one about which we don't have any, at this point, formal guidance from our State Court.  Nevertheless, it seems to me that in a case of this kind, if we make a mistake it ought to be on the side of fully explaining mitigation, fully explaining to the Jury how they can give effect to the mitigation, if they find that it exists, and not simply, for the sake of brevity, put something in there that sounds like it might be alright, but doesn't accurately explain to the Jury what their obligation is.

The trial court expressed his concern with applicant's proposal of having the jurors' write the word "life" in the blanks for the special issue, and noted, "By answering 'No' they may have decided that the State didn't meet its burden of proof, or that there is. . . ."  Defense counsel interrupted to explain how the statutory scheme itself was deficient:

But that's the whole–with regard to the Court, that's the whole idea of mitigation, that even if the evidence supports "Yes" answers to both the Special Issues beyond a reasonable doubt, even if that is the case, and the State has carried their burden of proof, the Jury can consider mitigating factors, and come to the conclusion that because of the mitigating factors, in spite of the fact that the evidence supports an answer to these two Special Issues of "Yes" beyond a reasonable doubt, because of the mitigating factors the jury feels that the death penalty should not be imposed– that is, indeed, the whole problem because our statutory scheme doesn't give any way to give effect to that.

Later, defense counsel again reiterated that the statutory special issues are one thing, but that the jury must receive instructions such that it can use and give effect to the mitigating evidence outside of the statutory special-issue scheme.

[15] Applicant's proposed additional instruction read,

You may use a mitigating circumstance to answer a Special Issue "no" or you may use a mitigating circumstance as a basis for leniency even if you are persuaded that all of the Special Issues must be answered "yes."  If you decide that all of the Special Issues must be answered "yes" and you also have found

that the jury be told to write the word "life" into the "yes" or "no" verdict forms if it should decide that the mitigating evidence called for such a sentence. The trial judge noted that nothing in Texas law allowed the jury to answer the special issues with the word "life" and that the explicit wording and specific answers to the special issues were statutorily required. Therefore, the trial judge declined to give applicant's additional instruction.

During closing arguments, the defense stressed that, regardless of what the jury thought about the special issues, it could not forget to consider the mitigating evidence. Counsel emphasized applicant's youth, his poverty, and the trauma he had suffered when the truck ran over him as a three-year-old. He noted that at least one doctor thought he could have brain damage. The State reminded the jury that it bore the burden of proving the special issues, but the decision of whether mitigating circumstances existed was a decision solely for the jury to determine. The jury answered both special issues "yes," and the trial court sentenced applicant to death.

On November 24, 1993, this Court affirmed applicant's conviction and sentence on direct appeal.[16] One of the issues that applicant raised on appeal was that the trial court erred "in failing to instruct the jury of a method to be used by them to give effect to mitigating

---

mitigating circumstances which call for a life sentence, you must not answer the Special Issues. Instead, to give effect to the mitigating circumstances, you must write the word "life" in each of the spaces on the verdict sheet where you would otherwise answer the Special Issues "yes" or "no." A verdict of life has the same effect as a verdict that answers at least one Special Issue "no."

[16] *Hood v. State*, No. 71,167 (Tex. Crim. App. Nov. 24, 1993) (not designated for publication).

evidence."[17]     Once again, applicant's claim echoed the Supreme Court's most recent pronouncements concerning the Texas death-penalty sentencing scheme.  We rejected that claim, both because it was inadequately briefed and on its merits, concluding that the nullification instruction "did provide the jury with an adequate vehicle to express *and give effect* to its 'reasoned moral response'" to applicant's mitigation evidence, if any existed.[18] The United States Supreme Court denied *certiorari*.[19]

On December 22, 1997, applicant filed his first writ application under article 11.071.[20] In that application, he initially challenged the nullification instruction, but then deleted that claim from his amended application.[21]  On April 21, 1999, we denied habeas corpus relief.[22] Applicant then filed a writ application in federal court.  The federal district court denied relief, but granted a certificate of appealability on two grounds related to an *Ake*[23] claim.  On April 2, 2004, the Fifth Circuit affirmed the district court's denial of relief in an unpublished

---

[17] *Id.*, slip op. at 18.

[18] *Id.*, slip op. at 20 (emphasis in original).

[19] *Hood v. Texas*, 513 U.S. 834 (1994).

[20] TEX. CODE CRIM. PROC. art. 11.071.

[21] Presumably applicant eliminated that *Penry* claim because it had already been rejected on direct appeal and this Court does not re-review claims in a habeas corpus application that have already been raised and rejected on direct appeal.  *Ex parte Reynoso*, 257 S.W.3d 715, 723 (Tex. Crim. App. 2008) (a claim that was raised and rejected on direct appeal is not cognizable on habeas review under art. 11.071); *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984).

[22] *Ex parte Hood*, No. 41,168-01 (Tex. Crim. App. Apr. 21, 1999) (not designated for publication).

[23] *Ake v. Oklahoma*, 470 U.S. 68 (1985).

opinion.[24]  Once again, the United States Supreme Court denied *certiorari*.[25]

On May 24, 2004, applicant filed a *pro se* subsequent application for writ of habeas corpus, which we dismissed as an abuse of the writ under art. 11.071, § 5.[26]  That second application did not contain a *Penry* claim.

On June 22, 2005, eight days before his scheduled execution, applicant filed a third writ application, alleging that "the nullification instruction in applicant's case did not allow the jury to consider and give effect to mitigating evidence presented at trial."[27]  It "suffered from the same constitutional defects that the Supreme Court found fatal" in *Penry II*,[28] *Smith v. Texas* ("*Smith I*"),[29] and *Tennard v. Dretke*.[30]  We granted applicant's motion for stay of execution and concluded that "applicant has met the requirements for consideration of a claim the basis of which was not available at the time his initial application was filed."[31]  We remanded the case to the convicting court for consideration of the merits of applicant's *Penry*

---

[24] *Hood v. Dretke*, No. 00-41272, 93 Fed. Appx. 665 (5th Cir. 2004) (not designated for publication).

[25] *Hood v. Dretke*, 543 U.S. 836 (2004).

[26] *Ex parte Hood*, No. WR-41,168-02 (Tex. Crim. App. April 13, 2005) (not designated for publication).

[27] *Ex parte Hood*, No. WR-41,168-03, slip op. at 2 (Tex. Crim. App. June 27, 2005) (not designated for publication).

[28] *Penry v. Johnson*, 532 U.S. 782 (2001).

[29] 543 U.S. 37 (2004).

[30] 542 U.S. 274 (2004).

[31] *Ex parte Hood*, No. WR-41,168-03, slip op. at 2.

claim.[32]  On remand, the habeas judge set out his factual findings and concluded,

> Although opinions may vary regarding how clearly the mitigating evidence
> was elicited at trial and whether such evidence is overwhelming or tenuous, the
> record contains such evidence that a jury must, under our current law, consider
> regarding the imposition of the death penalty.

The habeas judge also entered relevant conclusions of law: first, he concluded that

applicant's "nullification" claim was unavailable at the time he filed his previous habeas

application;[33] second, he concluded that the two special issues did not provide an avenue for

the jury to give *full* consideration and *full* effect to applicant's mitigating evidence.[34]  The

---

[32] *Id.*

[33] The habeas court's conclusions of law included the following:
1.  Prior to the Supreme Court's decisions in *Tennard* and *Smith*, the Court of
    Criminal Appeals had concluded that, without a "prima facie" showing of a severe
    and permanent handicap, not of his own making, which is [at] least related to the
    commission of the capital offense, a defendant could not pursue a claim
    challenging the failure of the special issues to provide a vehicle for the
    consideration of mitigating evidence.  This standard was overturned by the
    Supreme Court in *Smith* which makes [it] clear that the legal basis for asserting a
    meritorious nullification claim was unavailable to Hood at the time he filed his
    previous habeas application.
2.  On March 15, 2005, the Court of Criminal Appeals held that the legal basis for raising a
    meritorious nullification claim was previously unavailable prior to the Supreme Court's
    decisions in *Tennard* and *Smith* in *Ex parte Robertson*.  In *Robertson*, this Court
    acknowleged that these Supreme Court decisions provided grounds for authorizing a
    subsequent habeas application in stating, "Accordingly, the legal basis for Applicant's
    claim was unavailable on the date he filed the previous application, and he meets the
    requirements of Article 11.071, §5(a)(1)."
4.  In *Tennard* and *Smith*, the Court indicated that mitigating evidence includes potential
    organic learning disabilities, speech handicaps, low I.Q. (but not within the range of
    mental retardation), special education training in school, difficult childhood
    circumstances, impaired intellectual functioning and mental and emotional development
    that lagged several years behind chronological age, having mitigating value.

[34] The habeas judge's seventh conclusion of law reads,
The two special issues given the jury in this case do not provide an avenue for the

habeas judge recommended that we grant applicant a new punishment trial based on the newly available decisions in *Tennard* and *Smith I*.

A majority of this Court held that, although we had originally determined that applicant's claim surmounted the section-5[35] bar against subsequent claims because his *Penry* claim, raised after *Tennard* announced new law, was unavailable at the time he filed his first two writ applications, we were wrong.[36] The majority concluded that applicant–by the time he filed his *pro se* application in May of 2004–should have known from the *Penry II* decision that he had a viable claim concerning both the lack of a special mitigation issue and the infirmity of the jury-nullification instruction.[37] On January 10, 2007,[38] we dismissed applicant's subsequent writ.[39]

On September 8, 2008, just two days before his rescheduled execution, applicant filed a suggestion that the Court reconsider its January 10, 2007, order because the three newest

---

jury to give full consideration of the mitigating evidence adduced at trial. . . . Thus, under the evidence in this case, to be constitutional, there should have been a special issue submitted to the jury that allowed the jury to give full consideration and full effect to the mitigating evidence. That special issue must allow them to answer the questions directly as the current[] law provides.

[35] TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1).

[36] *Ex parte Hood*, 211 S.W.3d 767, 770 (Tex. Crim. App. 2007).

[37] *Id*. at 777-78.

[38] This date was a little more than three months before the Supreme Court issued its opinions in *Abdul-Kabir* and *Smith II*, the cases that clarified the interplay between mitigating evidence and the instructions required for the jury to fully consider that evidence under the Texas sentencing scheme.

[39] *Ex parte Hood*, 211 S.W.3d at 780.

Supreme Court cases, delivered after our dismissal, finally made it clear that our prior interpretations of *Penry I* and *Penry II* were incorrect.

Applicant also noted that, in several *Penry* habeas corpus application cases decided after *Abdul-Kabir, Brewer*, and *Smith II*, we had reconsidered our original dismissal, held that *Tennard, Smith I, Abdul-Kabir*, *Brewer*, and *Smith II* announced new law, and addressed the merits of the death-row inmate's habeas corpus claim.[40] There are now several more such cases in which we have addressed the merits of a *Penry* claim in a subsequent writ

---

[40] Applicant cited *Ex parte Moreno*, 245 S.W.3d 419, 429-31 (Tex. Crim. App. 2008) (reconsidering applicant's previously dismissed *Penry* claim, concluding that *Abdul-Kabir*, *Brewer*, *Smith II*, and *Tennard* constituted a new legal basis under 11.071, § 5, and holding that those cases held that a defendant's mitigating evidence of "a troubled childhood" required special instructions so that the jury could fully consider its mitigating value outside the statutory special issues; relief granted); *Ex parte Martinez*, 233 S.W.3d 319, 323 (Tex. Crim. App. 2007) (relief granted on subsequent habeas corpus application on *Penry* claims based on *Smith I, Tennard, Abdul-Kabir, Brewer,* and *Smith II*; "We further believe that the recent United States Supreme Court precedent . . . compels a decision that applicant presented 'constitutionally relevant mitigating evidence' at his 1989 trial and that the jury did not have a vehicle to give this evidence 'meaningful consideration'") (quoting *Abdul-Kabir*); *Ex parte Kim Ly Lim*, No. WR-56,297-01, 2008 WL 2391119 (Tex. Crim. App. June 4, 2008) (*per curiam*) (not designated for publication) (remanding subsequent writ containing *Penry* claim to habeas court; "Upon reviewing the subsequent application, and in light of intervening United States Supreme Court decisions, this Court has determined that Applicant's third claim concerning the nullification instruction given at the punishment stage of his trial should not have been dismissed as an abuse of the writ but remanded to the trial court for its consideration."); *Ex parte Hathorn*, No. AP-75917, 2008 WL 2058677 (Tex. Crim. App. May 14, 2008) (*per curiam*) (not designated for publication) (reconsidering applicant's previously dismissed *Penry* claim). Hathorn received relief and was granted a new trial on punishment in *Ex parte Hathorn*, 296 S.W.3d 570 (Tex. Crim. App. 2009) (relying on *Brewer* and *Abdul-Kabir* and holding that applicant was not required to object at trial or raise *Penry* issue on appeal to obtain relief under most recent Supreme Court cases; "Because the mitigating evidence presented at Applicant's trial is the type of evidence for which he was entitled to a separate vehicle for consideration, we remand the case to the trial court for [a] new punishment hearing.").

application based upon the Supreme Court's five most recent cases,[41] all of which were

delivered after applicant had filed his *pro se* application on May 24, 2004.

II.

The crucial issue in the present case (as it was in the nine recent Texas cases cited

above) is whether the five Supreme Court cases delivered between June 2004 and April 2007

announced "new law" that could serve as a basis for a subsequent writ application or whether

they simply followed established law.  Under our Texas habeas-corpus statute, an applicant

may not have the merits of a subsequent writ considered unless he passes over the threshold

of article 11.071, § 5, which requires a showing of newly available law or facts.  Thus, if

---

[41] *See, e.g., Ex parte Davis*, No. AP-76,263, 2009 WL 3839065 (Tex. Crim. App. Nov. 18, 2009) (*per curiam*) (not designated for publication) (reconsidering and granting relief on applicant's second subsequent habeas corpus application, by relying on Texas's post-*Abdul-Kabir,* and *Tennard* cases, even though applicant had failed to object at trial to the sentencing scheme and special issues; concluding that "[b]ecause the mitigating evidence presented at applicant's trial is the type of evidence for which he was entitled to a separate and sufficient vehicle, we remand the case to the trial court for a new punishment hearing."); *Ex parte Buntion*, No. AP-76236, 2009 WL 3154909 (Tex. Crim. App. Sept. 30, 2009) (*per curiam*) (not designated for publication) (granting relief on subsequent writ application alleging *Penry* error and relying on other post-*Abdul-Kabir* and *Tennard* Texas cases; remanding for new punishment hearing); *Ex parte Rachal*, No. WR-60394-02, 2009 WL 3042631 (Tex. Crim. App. Sept. 23, 2009) (*per curiam*) (not designated for publication) (remanding subsequent writ application for determination of the merits of *Penry* claim because requirements of art. 11.071, § 5 were met); *Ex parte Jones*, No. AP-75896, 2009 WL 1636511 (Tex. Crim. App. June 10, 2009) (not designated for publication) (relying on *Abdul-Kabir*, *Brewer*, and post-*Abdul-Kabir* Texas cases to address the merits of a subsequent habeas application claiming *Penry* error, but denying relief because applicant's mitigating evidence could be fully addressed under the scope of the former special issues); *Ex parte Robertson*, No. AP-74720, 2008 WL 748373 (Tex. Crim. App. March 12, 2008) (*per curiam*) (not designated for publication) (finding that applicant met the requirements for consideration of his subsequent claim under art. 11.071, § 5, based on *Smith I*, and granting relief because "applicant presented mitigating evidence, for which under *Penry I* there had to be an adequate means for the jury to consider beyond the limits of he special issues").

*Tennard*, *Smith, et al.* announced new law, we may consider the merits of applicant's claims. If they are mere applications of previously available law, we are statutorily required to dismiss his subsequent application as an abuse of the writ.[42]

On the other hand, federal courts are not permitted to grant a state petitioner's writ application complaining about a state-court decision unless the state court's determination of the legal issue was an unreasonable application of clearly established law as announced by the Supreme Court.[43] In other words, this Court may address applicant's claim only if *Tennard*, *Smith, et al.* are newly available legal claims, whereas federal courts may grant petitioner's claim only if this Court has misapplied clearly established federal law.

This is all very awkward. To grant a Texas death-row inmate relief on his subsequent

---

[42] TEX. CODE CRIM. PROC. art. 11.071, § 5.

[43] 28 U.S.C. § 2254(d)(1). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a writ of habeas corpus 'with respect to any claim that was adjudicated on the merits in State court proceedings' unless the petitioner shows that the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or that the state court's adjudication of a claim 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006); *see Brown v. Payton*, 544 U.S. 133, 141-43 (2005) (concluding that 9th Circuit erred in granting relief; holding that, under AEDPA, "[e]ven on the assumption that [the California Supreme Court's] conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review"); *Williams v. Taylor*, 529 U.S. 362, 406, 409, 412 (2000) ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"; holding that "clearly established Federal law" means "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision," and explaining that a state-court decision is contrary to the Supreme Court's "clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent").

*Penry I* and *Penry II* claim under the recently decided *Tennard*, *Smith, et al.* cases, we must find that those decisions announced new law, but the federal courts cannot grant relief on those very same claims unless they find that Texas courts misapplied clearly established law at the time of the relevant state-court decision.[44]  Hence, a death-row inmate must argue in this Court that *Tennard*, *Smith, et al.* announced new law, but, once he arrives in federal court, he must argue that those same cases simply reiterated clearly established law.  There is no logical way in which *Tennard*, *Smith, et al.* can simultaneously be both "newly available law" for state-court purposes and "clearly established law" for federal-court purposes.

This conundrum has produced starkly different descriptions and versions of the historical development of *Penry* law.  In each of the five most recent cases, the United States Supreme Court majority has been at pains to emphasize that "well before our decision in *Penry I,* our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty[.]"[45]  Thus, *Penry* itself did not announce new law, nor did the five most recent cases, *Tennard, Smith I, Abdul-Kabir, Brewer,* and *Smith II.*[46]  Under

---

[44] *See, e.g., Nelson*, 472 F.3d at 303 (concluding that *Tennard* and *Smith* merely reaffirmed clearly established law that existed in 1994 when Nelson's conviction became final).

[45] *Abdul-Kabir,* 550 U.S. at 246.

[46] *See id*., at 246-65 (concluding that "[o]ur cases following *Lockett* have made clear that when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence–because it is forbidden from doing so by statute or a judicial interpretation of a statute–the sentencing process is fatally flawed.").

the majority's reasoning, this Court (along with the Fifth Circuit) completely misunderstood the scope and applicability of *Penry* for almost twenty years and reached "'decision[s] that [were] contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'"[47] in virtually all of our *Penry* cases.  Had the Supreme Court concluded otherwise, it could not have granted relief to any of the habeas corpus applicants in *Tennard, Smith I, Abdul-Kabir, Brewer,* or *Smith II*.

Not surprisingly, the four dissenters in *Abdul-Kabir*–led by Chief Justice Roberts–set out an entirely different version of the *Penry* history.[48]  The dissenters noted that "[t]he only thing clear about our jurisprudence on the pertinent question [whether this Court's decision in *Abdul-Kabir* was "objectively unreasonable" under firmly established Supreme Court precedent] in 1999, however, is that it was unsettled and confused."[49]  Chief Justice Roberts stated, "It is a familiar adage that history is written by the victors, but it goes too far to claim that the meaning and scope of *Penry I* was 'clearly established' in 1990[.]"[50]

Not only have the nine justices on the Supreme Court differed wildly in their view of the *Penry* saga, the nine judges on this Court have differed in exactly the same manner.  For example, in the January 2007 decision rendered on applicant's *Penry* claim, five members

---

[47] *See id.* at 246 (quoting 28 U.S.C. § 2254(d)(1)).

[48] *See Abdul-Kabir*, 550 U.S. at 268-78 (Roberts, C.J., dissenting).

[49] *Id.* at 268.

[50] *Id.* at 275.

of this Court set out a history of *Penry* jurisprudence similar to some of that of the Supreme Court majority in *Abdul-Kabir*. Under that understanding–*Penry II* announced new law, but *Tennard* and *Smith* did not–applicant was not entitled to have the merits of his claim addressed in his 2005 application because he had filed a *pro se* post-*Penry II* application that did not raise a *Penry* claim.[51] But, according to the Supreme Court in *Abdul-Kabir*, we were wrong on that understanding as well: neither *Penry I* nor *Penry II* announced new law.[52]

---

[51] *Ex parte Hood*, 211 S.W.3d 767, 780 (Tex. Crim. App. 2007). The majority concluded, Applicant was excused from presenting a *Penry*-type claim in his *first* application because we held on his direct appeal that the nullification instruction was adequate. That holding was sufficient to defeat a claim for relief, and binding precedent suggesting the incorrectness of that holding (*i.e. Penry II* ) did not yet exist. But applicant was not excused from presenting this claim in his *second* application because it was filed after *Penry II,* which afforded a new basis to challenge our previous holding. *Smith II* did not supply a previously unavailable legal basis for challenging our original nullification holding because that basis had already been supplied by *Penry II,* and, even though applicant had the opportunity to litigate *Penry II* in his second application, he did not do so and thus received no adverse ruling from this Court holding *Penry II* inapplicable.

*Id.* One might forgive applicant for not recognizing that he had a valid *Penry I* and *Penry II* claim in May of 2004, because we had not yet recognized that fact ourselves. Just one month earlier, in April of 2004, we delivered our opinion in *Ex parte Smith*, 132 S.W.3d 407 (Tex. Crim. App. 2004), in which we held that (1) the defendant's troubled childhood and somewhat limited ability did not qualify as constitutionally significant *Penry* evidence such that it required any special instruction as a vehicle for the jury to give it mitigating effect; and (2) the nullification instruction was a sufficient vehicle to accord full weight to his mitigating evidence. In other words, we would have treated applicant's 2004 *Penry* claims (had he raised them) just as we had treated Smith's. The Supreme Court reversed our decision as incorrect on both counts. *Smith v. Texas (Smith I)*, 543 U.S. 37 (2004); *Smith v. Texas (Smith II)*, 550 U.S. 297 (Tex. Crim. App. 2007). If we did not recognize the validity of a *Penry* claim in April of 2004, we can hardly expect a death-row inmate, filing his *pro se* application one month later, to be more prescient than ourselves.

[52] *Abdul-Kabir*, 550 U.S. at 248 n.10 (noting that the rule sought by applicant in *Penry I* was not "a new rule" because it was "dictated" by earlier precedent), at 253 (reiterating that "Penry was not asking us to make new law because he was relying on a rule that was 'dictated' by earlier cases").

Thus, under *Abdul-Kabir*, this applicant, during his 1990 trial, was simply asking for instructions that were required by clearly established Supreme Court law, and we were objectively unreasonable in failing to reverse the punishment verdict on direct appeal.[53] The four dissenters in *Ex parte Hood* set out a version of the *Penry* litigation similar to that of Chief Justice Roberts's in *Abdul-Kabir* and contended that *Tennard* and *Smith I* announced new law and thus applicant was entitled to have the merits of his claim addressed.[54]

But regardless of which historical version of *Penry*-litigation one accepts–(1) it was clearly established that the Texas sentencing scheme concerning the use of mitigation evidence was constitutionally flawed even before *Penry I,* or (2) *Tennard, Smith*, *et al.* announced new constitutional law–applicant is entitled to relief in one court or the other. He is entitled to relief in federal court if *Penry* did not announce new law because the Texas courts were "objectively unreasonable" in addressing his *Penry* claim all along.[55] Or, if *Tennard, Smith, et al.* did announce new law, he is entitled to relief in this Court because his claim is not procedurally barred under article 11.071, § 5, and the habeas judge's factual findings and legal conclusions recommending relief are supported by the record.

---

[53] *Hood v. State*, No. 71,167 (Tex. Crim. App. Nov. 24, 1993) (not designated for publication), *see e.g., Nelson v. Quarterman*, 472 F.3d 287, 303 (5th Cir. 2006).

[54] *Ex parte Hood*, 211 S.W.3d at 795 (Cochran, J., dissenting).

[55] *Abdul-Kabir*, 550 U.S. at 237 (stating that we "misapplied the law as clearly established" before Abdul-Kabir's 1990 trial when we denied his habeas corpus claim that "there is a reasonable likelihood that the trial judge's instructions to the Texas jury that sentenced him to death prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence."). If the applicable constitutional law was "clearly established" in 1990 when Abdul-Kabir was tried, it was clearly established when applicant was tried that same year.

III.

Because we have already held, in numerous subsequent habeas applications since 2007,[56] that *Tennard, Smith, et al.* did announce new law and that those death-row inmates were entitled to have the merits of their *Penry* claims addressed, we must treat applicant's *Penry* claim in the same manner. Similarly situated litigants bringing similar claims should be treated similarly. Most recently, in *Ex parte Davis*, a case much like the present one, we reconsidered, on our own initiative, a previously dismissed *Penry* writ application "because of changes in the law" and concluded that

> [t]he nullification instruction given to applicant's jury was not a sufficient vehicle to allow jurors to give meaningful consideration and full effect to the mitigating evidence presented by applicant. Because the mitigating evidence presented at applicant's trial is the type of evidence for which he was entitled to a separate and sufficient vehicle, we remand the case to the trial court for a new punishment hearing.[57]

We see no reason to treat applicant inconsistently. Therefore, we adopt the habeas judge's factual findings, agree with his legal conclusions, and accept his recommendation to grant relief. This case is remanded to the trial court for a new punishment hearing.

Delivered: February 24, 2010

Publish

---

[56] *See* notes 40 & 41 *supra*.

[57] *Ex parte Davis*, No. AP-76,263, 2009 WL 3839065 at *2 (Tex. Crim. App. Nov. 18, 2009) (*per curiam*) (not designated for publication).